GERTRUDE KAISER and GERALD KAISER, Appellants, v. THE REARDON COMPANY, Employer, and GREAT AMERICAN INDEMNITY COMPANY, Insurer.—No. 39684.—195 S. W. (2d) 477.

Division One, June 10, 1946.

Rehearing Denied, July 8, 1946.

*Albert I. Graff, Jasper R. Vettori* and *Malcolm I. Frank* for appellants.

*Oliver J. Miller* and *Lashly, Lashly, Miller & Clifford* for respondents.

GANTT, J.—Action for workmen's compensation. The commission found that Herbert Kaiser, an employee, now deceased, suffered an accidental injury arising out of and in the course of his employment on August 9, 1941. It made an award in favor of claimants, the widow and son five years of age, in excess of $7500. At the instance of the employer and insurer, the case was transferred to the circuit court for review. On review, the circuit court found that there was no substantial evidence to support the finding of the commission and reversed the award. Claimants appealed.

The material facts follow: Herbert Kaiser was an employee of the Reardon Company on Saturday, August 9, 1941, as shipping clerk. At that time Joseph Vincent Errico also was an employee of said company as a chemist. He admitted that on said date at 11:30 A. M. he shot and killed Kaiser in the shipping room of the company. At the time no other person was present in the shipping room. In other words, no one witnessed the killing. As an employee of the company Kaiser was, on August 9, 1941, in charge of the supplies, including paint, at the company's place of business. Errico is now serving a twenty year sentence in the penitentiary for the murder. Claimants called Errico as a witness. He testified as follows:

"My name is Joseph Vincent Errico, and I am the same person from whom this Commissioner, and Mr. Clifford and Mr. Vettori attempted to obtain testimony at the City Jail on two occasions. Prior to Aug. 1941, I worked at the Reardon Company. I had worked there one year as a chemist. They are located at Second and Clinton Streets, St. Louis, Missouri. I knew Herbert Kaiser, who was also employed at the Reardon Company during all the time I was there. He was the receiving clerk. To my knowledge he had been working there about eight years. I worked on Saturday occasionally. Mr. Kaiser worked on Saturday. I was not working the morning of August 9, 1941. I was out in the county at a clubhouse. We left the clubhouse about 9:30, stopping at my home on Burwood Drive. I changed shirts and took the gun I had from the dresser drawer where my shirts were, and proceeded to the Reardon Company. My wife accompanied me.

"We parked on Second Street facing North. I went into the Plant to obtain some paint for a friend of mine.

"Commissioner Lahey: That was the plant of the Reardon Company? A. Yes. Before I had an opportunity to get any paint we become involved in an argument, a personal argument.

"Q. (Mr. Graff) Who was 'We'? A. Herbert Kaiser.

"Q. And yourself? A. Yes, sir. The argument lasted several minutes and he struck me and knocked me to the floor. Upon arising I fired one shot.

"Q. What was this argument about? A. It was a personal argument.

"Q. Were you going to take some paint with you? A. That was my intentions.

"Q. And Mr. Kaiser told you that you could not take that paint unless you got an authorization receipt? A. He didn't know I was going to take any paint. I didn't get that far.

"It was around 11:30 that this shooting occurred on a Saturday. My employment with the company was as a chemist. If I had any work to finish up I would work on a Saturday. The shooting occurred in a room where paint was stored. The Reardon Company

had a shipping platform. Kaiser had an office in the hallway lead-
ing from Second Street to what is known as the 'package room'. The
shooting occurred in the package room. I don't know exactly how
far distant from Kaiser's office was this package room. The package
room was part of the Reardon plant, and was a part of the plant
where Kaiser's duties required him to be.''

Cross-Examination.

''I had been with the Reardon Company about 21 years. Before
going into the Chemistry Department I had other positions with the
company. I started as foreman, then was promoted to superintendent,
and then to chief chemist. I held those positions at one time up until
ten years ago. At one time I was foreman and superintendent and
chief chemist. I am related to J. V. Reardon, President of the com-
pany, as brother-in-law. He married my sister. During the time I
had been there as superintendent I had the right to advise and direct
other employees, and after being moved up from superintendent to
chief chemist I still had authority there in the plant. Over a period
of years, when my needs required it, I had taken whatever paint was
necessary for my needs there at the plant. I had authority to do that.
On a number of occasions prior to August, 1941, I had done that with
Kaiser there in the paint and shipping room. I had no trouble of
any kind with Mr. Kaiser about the removal of paint. I was Mr.
Kaiser's superior. As chemist, if I required any paint at any time
I was free to go to the shipping or paint room and remove any
quantity of paint I needed. That had occurred on numerous occa-
sions when Kaiser was present and when other employees were pres-
ent. On August 8, 1941, I went down to the plant to get some paint.
There was nothing unusual about that. I had done that on many
prior occasions. It was about 11:30 when I reached the plant. I
went to the paint and shipping room.

''Q. At any time that morning did you touch any paint, would
you say? A. I did not.

''Q. Did you indicate to Kaiser at any time that you had come to
get some paint? A. I had not.

''Q. Was there any conversation between you and he about re-
moving any paint? A. No.

''Q. Was paint mentioned in any way in the conversation you had
with him? A. No.

''Q. Did you so much as attempt to remove one pound or a half
pound, or any quantity of paint? A. No.

''Q. As I understand it when you arrived there that morning you
had a conversation with Kaiser? A. That is correct.

''Q. And that conversation that you had with him led to a fight
between you? A. That is correct.

"Q. And did the conversation you had with him involve any paint in any way? A. It didn't involve any paint or anything else belonging to the Reardon Company.

"Q. Was that a purely personal argument between you and Mr. Kaiser? A. It was a personal argument.

"Q. Had there been for some period of time personal feeling between you and Mr. Kaiser? A. That is correct.

"Q. Did you, what you might say, have a 'show-down' with him that morning about this personal matter? A. Yes.

"Q. And as a result of that did he strike you? A. That is right.

"Q. And as a result of his striking you he knocked you to the floor, is that correct? A. That is correct.

"Q. And then it was you pulled your revolver and shot him? A. That is correct.

"Q. And during the conversation leading up to his striking you and the shot that you fired at Mr. Kaiser—as I understand you had had nothing to do with the Company property? A. That is correct."

J. V. Reardon, president of the employer company, testified as follows:

"Q. Now you say Mr. Errico was a chemist there? A. Yes.

"Q. As such did he have any supervision over Herbert Kaiser? A. No, he was not his boss, if that is what you mean.

"Q. Was he authorized to give Herbert Kaiser any instructions or any suggestions with respect to the conduct of the Company business. A. No.

"Q. Who was Mr. Kaiser's superior? A. Well, Mike Reardon as superintendent of the plant was Mr. Kaiser's superior. Generally, if anything happened in the plant they would come to me if I am there—we have a small company and we don't draw the line; I am always available if anyone wants to talk to me about anything.

"Q. Did you know Herbert Kaiser very well, in his lifetime? A. Yes, I came in frequent contact with him.

"Q. What type of man was he with respect to peace and quiet? A. My impressions was he was a very peaceful person."

It is clear that the commissioners disbelieved the testimony of Errico with reference to the cause of the controversy. They were authorized to do so. Furthermore, they could and did infer from Errico's testimony, above set forth, that Kaiser refused to permit him to remove paint from the plant for a friend. Furthermore, they could and did infer from said testimony that this caused the controversy, which resulted in Kaiser's death. If they so inferred, as they were authorized to do, the findings of the commission was supported by substantial evidence, and the judgment should be reversed and the cause remanded with directions to affirm the award. It is so ordered. All concur.