FLORENCE STEPHENS, Dependent of LEM STEPHENS, Deceased, Respondent, v. SPUCK IRON & FOUNDRY COMPANY, a Corporation, Appellant.—No. 40806.—214 S. W. (2d) 534.

Division One, November 8, 1948.

*Jesse L. Renderer, Norris H. Allen,* and *Anderson, Gilbert, Wolfort, Allen & Bierman* for appellant.

*Champ C. Stonebraker* for respondent; *Orville Richardson* of counsel.

[535] BRADLEY, C.—This is a workmen's compensation case. Claimant received an award of $11,200 by the industrial commission and the self insured employer appealed to the circuit court. The circuit court sustained the finding of the commission and the employer again appealed.

Lem Stephens, deceased, was the employee; claimant is his widow and sole dependent. Two contentions are made by appellant: (1) That there was no substantial evidence that the accident, which claimant says resulted in the death of her husband, arose out of and in the course of his employment; and (2) that there was no substantial evidence that the injury received in the accident caused or contributed to the death.

Deceased was a moulder; was 60 years old; had been employed by appellant at its foundry in St. Louis for about 5 years. November 6, 1946, he sustained an injury at appellant's foundry; was taken to the Christian Hospital, St. Louis, where he died November 20th, two weeks after injury. Edward B. Stengel, a moulder, also worked at appellant's foundry. About 2 or 3 weeks prior to November 6th, there was some discussion by the employees about working on Saturday. Some wanted to work on Saturdays; others did not. Stengel was among those who opposed working on Saturday; deceased was among those who favored working on Saturday. November 6th, day of accident, was on Wednesday. Deceased had worked on the previout Saturday; Stengel did not.

About 2:30 p. m., November 6th, Stengel, Emanuel Gaona, John P. Conley, Walter Semenske, and Marion Sabatino, moulders, were sitting on, or were about a bench in what is termed the doghouse. They were waiting "for the iron to come down." Such waits occurred now and then when the iron was not hot enough for delivery to the moulders. Deceased came into the doghouse and an altercation occurred between him and Stengel; deceased tripped and fell;

his left hip was broken by the fall and he died two weeks thereafter, as stated. Gaona, Conley and Semenske were witnesses for claimant. They testified as follows:

Gaona: "Stephens came in and said to Stengel, 'Are you working here Saturday?' Stengel said it was going to be the last Saturday for deceased; he said, 'Don't work no more on Saturday.' I heard them yell, 'Don't hit that man', and the man (deceased) he fell down; he stayed down and everybody ran off in the shop; ran off so they didn't want to see anything."

Conley: "Stephens came in and started talking to Stengel about Saturday work. He (Stengel) laid off from work one day; I didn't hear what it was all about. Stengel grabbed him by the collar and sort of swung at him and Stephens fell. The argument [536] was over working or not working on the previous Saturday. Stengel and I were standing there and Stephens came up and said something to him and when the argument started I started walking away. Stephens opened the discussion. I heard Stephens cuss him; that was before Stengel struck at him. Stephens sort of tripped and fell; I was 5 or 6 feet from Stephens."

Semenske: "Stephens walked up and said to Stengel, 'It didn't do you no good to lay off on Saturday.' Stengel said, 'No, but you ain't going to work next Saturday, or something like that', and Stephens said, 'Well, if I want to, I'll work; go ahead and ask the boss and he will let me work; it ain't nobody's damn business', or something like that. About that time Stengel grabbed him by the shirt. Stephens walked back 6 or 7 feet; he (Stengel) grabbed him and I guess he was trying to get out of the way. It looked like he fell over his feet; I couldn't say, but there was nothing there that I could see. Stephens and Stengel were good friends as far as I would know; I never saw them have any trouble; they were not mad; this was just a discussion about Saturday work. The floor was a dirt floor with sand on it."

Sabatino and Stengel were witnesses for the appellant employer. Sabatino testified: "We were all sitting there waiting for the iron to come down and Stephens came and said (to Stengel), 'Just because you didn't work Saturday the shop didn't shut down; we kept on working.' Stengel said, 'Go ahead and work; anybody is working that wants to', and then he (Stephens) said, 'It ain't no skin off your a—', and then Stephens called him all kind of names. He (Stengel) went over there and like he was going to smack him and Stephens tripped and fell down. Stengel's blow wasn't heavy; it was with his open hand. It is the practice when the moulders are waiting for iron to gather around in a group and sit down and smoke."

Stengel testified: "I was sitting on a bench there; we were talking. Stephens came up and said to me, 'Well, you got fooled; we worked

Saturday and you thought we wouldn't work; well, I hope you are satisfied; you thought we wouldn't work Saturday, but we did work anyway.' I said, 'Well, are you going to work next Saturday?' and he said 'Yes, I am going to work Saturday, and Sunday, too; it ain't no skin off your a—, you c. s.' He started back towards me and I got off the bench and then walked up and slapped him with my left hand; I slapped him on the right cheek; and when he backed up or moved or tripped; he must have been moving back; I struck him and he went down.''

 In Gillmore v. Ring Construction Co. et al., 227 Mo. App. 1217, 61 S W. (2d) 764, the claimant and other employees had reported for work (pouring concrete) at 7:30 a. m.; weather conditions were not then favorable for the work. The foreman, however, told the claimant to wait around to see if the weather got better. Claimant then went to the usual place around the fire to wait; there were rocks on the ground about the fire and the ground was wet and slippery. The men were discussing in a somewhat jocular mood the subject of some of the men working on the previous Saturday forenoon in violation of a union rule. While claimant was telling what had occurred before the counsel an employee grabbed and shoved claimant and he fell on a rock and was injured. He was denied compensation by the commission on the theory that the injury did not arise out of and in the course of his employment. The circuit court reversed the finding of the commission, and the court of appeals affirmed the finding of the circuit court. In ruling the Gillmore case the court said: ''Employers, whose work require that men wait upon the job for work conditions, ought not to be heard to say that an accident, occurring out of the very conditions presented by the required waiting, is not compensatory. Men standing and waiting around an open fire on a damp December day naturally mill around and talk and even joke and indulge in what might be termed 'horseplay.' ''

In Keithley v. Stone & Webster Engineering Corp. et al., 226 Mo. App. 1122, 49 S. W. (2d) 296, a fellow employee commenced an argument with claimant, addressed a remark to him and was slapped by claimant. A little later the brother of the one slapped struck claimant in the eye causing serious injury. The commission denied compensation on the theory that the injury did not [537] arise out of and in the course of claimant's employment. The circuit court reversed and on appeal the court of appeals affirmed. The court said [49 S. W. (2d) l. c. 300]: ''The remark made to claimant was evidently interpreted by him to mean that he was a shirker or slacker and was cheating his employer. Whether this interpretation was justified or not, the offender knew that the employee resented his statement. The statement pertained to the employment and was connected with the work of the employer, and did not and could not

have referred to any other matter. . . . We think it within the legislative intent expressed in the compensation law to include such cases of assault as the one at bar and to afford compensation for injury so received.''

In Kaiser et al. v. Reardon et al., 355 Mo. 157, 195 S. W. (2d) 477, the claimants were the widow and minor son of an employee who was killed by another employee. The commission awarded compensation; the circuit court reversed; claimant appealed; the finding of the commission was sustained. The deceased was a shipping clerk and was in charge of the employer's supplies, including paint. One Errico was a chemist for the employer. Errico went to the plant to get some paint for a friend; he said that he was free to get paint from the shipping room as he needed it; that he had on numerous occasions got paint when deceased was present. Deceased was alone and Errico went alone to the shipping room; his was the only evidence as to what occurred. He testified: ''Before I had opportunity to get any paint we become involved in an argument, a personal argument; he struck me and knocked me to the floor. Upon arising I fired one shot. . . . It (the argument) didn't involve any paint or anything else belonging to the Reardon Company (employer). Q. Had there been for some period of time personal feeling between you and Mr. Kaiser? A. That is correct. Q. Did you, what you might say, have a 'show-down' with him that morning about this personal matter? A. Yes. Q. And as a result of that did he strike you? A. That is right. Q. And then it was you pulled your revolver and shot him. A. That is correct.'' In sustaining the finding of the commission the court said: ''It is clear that the commissioners disbelieved the testimony of Errico with reference to the cause of the controversy. They were authorized to do so. Furthermore, they could and did infer from Errico's testimony . . . . that Kaiser refused to permit him to remove paint from the plant for a friend.''

In the following cases it was held that the injury (accident) sustained by the employee arose out of and in the course of the employment. O'Dell v. Lost Trail, Inc. et al., 339 Mo. 1108, 100 S. W. (2d) 289 (employee was shot and killed after an altercation provoked in part by him); Hartford Accident & Indemnity Co. v. Cardillo et al., 112 Fed. (2d) 11 (a fellow employee, Downey, addressed claimant as Shorty; claimant called Downey a vile name; Downey assaulted claimant); Stulginski v. Waterbury Rolling Mills Co. et al., 124 Conn. 355, 199 Atl. 653 (claimant and a fellow employee, Cizauskas, worked near each other; Cizauskas thought claimant caused a floor smoke to go towards him to annoy him; he became angry and threw a block of wood at claimant; claimant threw some ashes at Cizauskas who rushed claimant, pushed him so that he fell and fractured an arm); Hansen v. Frankfort Chair Co. et al., 249 Ky. 194, 60 S. W. (2d) 349

(claimant was superintendent in a chair factory; convict labor was employed; claimant and a convict employee had some words about the work and claimant was struck and injured); Pekin Cooperage Co. v. Industrial Commission et al., 285 Ill. 31, 120 N. E. 530 (claimant was a stave culler; another culler, Miller, was near by; an argument arose about Miller getting staves from claimant's rack and claimant used offensive language; a fight followed and claimant was injured).

Swift & Co. v. Industrial Commission et al., 287 Ill. 564, 122 N. E. 796 (an argument arose about fixing a pipe; it was claimant's duty to fix the pipe, but he wasn't getting to it as promptly as Nieukirk, a fellow employee, thought he should; Nieukirk said he would take it up with the superintendent's office and see that the leak was fixed; claimant said, "all right you bastard, go ahead; I'll fix you", and assumed an attitude to strike, and Nieukirk hit him; [538] claimant fell upon the concrete floor and was injured); Newell v. Moreau, 94 N. H. 439, 55 Atl. (2d) 476 (Newell, employee, and Palmer were fellow employees; Newell criticized Palmer's work; Palmer invited Newell outside for a fight; Newell took off his coat and assumed a fighting pose, but did not strike; Palmer struck Newell who fell and sustained a fatal head injury); Knocks v. Metal Packing Corp. et al., 231 N. Y. 78, 131 N. E. 741 (claimant's foreman charged him with being responsible for the condition of a machine; claimant called the foreman a liar; the foreman struck him and injured his eye); Indemnity Ins. Co. of North America v. Scott et al. (Tex.), 278 S. W. 347 (Scott and Fowler were fellow employees of a packing house; some contents of a broken chitling thrown on the floor splashed on Scott's face; he became angry and asked "who in the ——threw that stuff" in his face; he started walking towards Fowler holding the knife that he used in his work; when about 8 feet away Fowler shot him; a witness testified that he did not think that Scott was about to stab Fowler).

In support of the contention that the injury deceased sustained, in the present case, when he fell did not arise out of and in the course of his employment, appellant cites the following assault cases: Staten v. Long-Turner Construction Co. et al. (Mo. App.), 185 S. W. (2d) 375; Sanders v. Jarka Corp. et al. (N. J.), 59 Atl. (2d) 415; Kimbro v. Black & White Cab Co. et al., 50 Ga. App. 143, 177 S. E. 274; Marion County Coal Co. v. Industrial Commission, 292 Ill. 463, 127 N. E. 84; Gross v. Great Atlantic & Pacific Tea Co. (La. App.), 25 So. (2d) 837; Triangle Auto Painting & Trimming Co. v. Industrial Commission et al., 346 Ill. 609, 178 N. E. 886; Merkel v. T. A. Gillespie Co. Inc., 10 N. J. Misc. 1081, 162 Atl. 250; Cherry et al. v. Magnolia Petroleum Co. et al. (Tex. App.), 24 S. W. (2d) 549; Fulton Bag & Cotton Mills v. Haynie, 43 Ga. App. 579, 159 S. E. 781; Garrett v. Texas-Louisiana Power Co., 19 La. App. 858, 141 So. 809.

In the Staten case, supra, a referee and the full commission held that claimant's injury did not arise out of and in the course of his employment; the circuit court sustained the finding; the court of appeals affirmed. Claimant was employed where a great many others worked; the crew he was in consisted of 40 or more black and white; they were drawing nails from lumber, common labor; claimant had forgotten to bring his lunch; a fellow worker, Donnelly, told him that he could share his lunch. Sometime before noon claimant left his place of work and, according to his version, went to get a crowbar and Donnelly's lunch bucket; he did not go to the toolhouse that was assigned to his crew (common labor), but went to the bolthouse. Campbell was in charge of the bolthouse. According to his version, when claimant came in he was asked what he was looking for and said that he was looking for a lunch bucket No. 6391; that he said nothing about a crowbar; that he was informed that there was no such bucket there and that he could not take any bucket out; that there had been complaints about lunch buckets being stolen. Claimant was told that the lunch bucket he was looking for was probably in the laborers' shack. Campbell told claimant to leave the buckets alone and to get out; claimant said that he knew what he was looking for and if he found it he was going to take it, "and no three white s. o. b's could stop him"; Campbell again told claimant to get out and go back to work; claimant again said if he found the bucket he would take it, and "if you try to stop me I'll hit you in the chin", using a vile epithet. He advanced towards Campbell in a threatening manner; shook his fist under Campbell's nose and threatened to bust him in the jaw. Campbell picked up a wrench and "busted" him. It was also in evidence that claimant made a statement in which he said: "This fight had nothing to do with my work; it was only over an argument about this dinner bucket. My only interest was to get this dinner bucket to get me some lunch for dinner. I had no other thought in mind." Donnelly further testified that this lunch bucket was in the common laborers' toolhouse and not at the bolthouse; that he had offered to share his lunch with claimant, but that he did not authorize claimant to get the lunch bucket and did not know that he had gone for it.

[539] In the Staten, Sanders, Kimbro, Gross, and Merkel cases, supra, cited by appellant, the industrial commissions, on the facts, found against the claimants on the theory that the respective assaults did not arise out of the employment and there being substantial evidence to support such findings, they were not overturned on appeal. In the Marion County Coal Company, and the Triangle Auto Painting & Trimming Company cases (Illinois) the commission found for the claimants and these findings were set aside on appeal. In the Marion County Coal case the court held that "his (claimant's) curs-

ing and abuse of Orison (who assaulted claimant) were not in respect to anything being done at the time and had no relation or connection with the present work or present conditions." In the Triangle, etc. case, the court found as in the Marion County Coal Company case that the assault did not *arise* out of anything connected with the work, and in the Triangle, etc. case the court distinguished the Pekin Cooperage Company case, supra, upon which claimant in the present case relies.

In the Cherry case, supra, the court found [24 S. W. (2d) 552] that the employee went "outside the scope of his employment and entered upon a private quarrel of his own for reasons of his own." In what we may term the Haynie case the facts are not given in the reported opinion, except that the injured employee was the aggressor in a fight with a fellow employee. It is stated that under the provisions of the Georgia workmen's compensation act, "a claimant is not entitled to compensation where the injury to the deceased employee was the result of a fight between him and a fellow employee in which the deceased employee was the aggressor." And from the Garrett case, supra, it would seem that Louisiana has a kind of an elastic rule as to an aggressor.

The opinion in Hartford Accident & Indemnity Co. v. Cardillo et al., supra, relied upon by claimant in the present case, was by Justice Rutledge when associate justice of the court of appeals, District of Columbia. The subject of horseplay and assault in workmen's compensation cases is considered at some length. It is pointed out that there are confusion and conflict in such cases. One of the forces suggested [112 Fed. (2d) l. c. 15 (9)] as a contributing cause to this confusion and conflict is the common law bar on profiting from one's own wrong. Another force suggested is the "now thoroughly dissipated notice that voluntary responsible action cannot be accidental."

In the present case it cannot be said as a matter of law that Stephens was the aggressor. He used offensive language it is true, but "language or epithets, however offensive, will not justify or excuse an assault." State v. Brown (Mo. Sup.), 165 S. W. (2d) 420. Also, one witness testified that Stephens and Stengel were not mad. The finding of the commission that the injury of the deceased arose out of and in the course of his employment should be upheld unless "it is clearly contrary to the overwhelming weight of the evidence." Scott v. Wheelock Bros. Inc. et al., 357 Mo. 480, 209 S. W. (2d) 149, l. c. 153, and cases there cited. The workmen's compensation law is liberally construed, and if, under the facts, there is doubt, such doubt must be resolved in favor of compensation. Conyers v. Krey Packing Co. (Mo. App.), 194 S. W. (2d) 749, l. c. 751, and cases there cited. We rule that there was substantial evidence to support

the finding of the commission that the injury deceased sustained when he fell arose out of and in the course of his employment.

The immediate cause of death was pulmonary embolism and the question is, Was there substantial evidence that the injury sustained in the fall was the cause or a contributing cause of the formation of the embolism? As to the injury of deceased and operation at the hospital, the hospital record under date of November 13th, shows that "under spinal anesthesia a 6-inch incision was made over the lateral aspect of the left femur region of the lower trochanter. Dissection carried down to bone; Smith-Peterson nail introduced over a guide wire and check X-rays show the fracture to be in apposition by means of the nail. Would closed in layers. . . . "

Dr. Gradwohl, claimant's witness, was shown X-ray pictures of the injured hip of deceased and testified that in his experience [540] he had occasion to see cases where there was a pulmonary embolism following such injury as the X-ray disclosed. "Q. Doctor, with trauma, where it is a fracture of the left femur as shown in this particular picture, is it possible for a man to have a pulmonary embolism? A. Yes. . . . Q. Now, doctor, assuming that a man 60 years of age received a fracture of the femur and he was confined to his bed in a prone condition, would there be any likelihood of a venous thrombosis? A. Yes. Q. Why, doctor? Will you tell us why? A. There are two factors in thrombosis or an embolism; one is the slowing up of the circulation from the patient's recumbent position, status; and then there is fragmentation of the blood; pieces of the thrombosis or foreign element being carried away into the circulation and getting into an important place like the pulmonary artery. . . . Now, assuming that in the treatment of the fracture of the femur the man was committed to bed, confined to his bed, would it from your observation, is it a common thing for them to develop pneumonia? A. It is (deceased developed pneumonia, but that had subsided before the operation). Q. Assuming that this pneumonia condition cleared up under proper treatment, would that predispose the patient to pulmonary embolism? A. It might, in this sense, that any complication that a person with that kind of injury and of that age, that it would be conducive towards a slowing of the circulation, causing the primary condition from which your embolism comes. Q. Slowing of the circulation is a primary cause of embolism? A. If he has got pneumonia we assume that the stress of the pneumonia on his body that that was a bad effect on the circulation."

On cross examination Dr. Gradwohl testified: "Q. Doctor, what are some of the causes of embolism? A. The causes of embolism— you mean a pulmonary embolism or an embolism? Q. Any embolism. A. Anything that slows the circulation or any foreign body that enters the circulation—a foreign body, for instance, like air or a sub-

stance injected into the venous system might start an embolism. Trauma to the veins might start it; injuries of any kind. Any condition, I should say, that slows up the circulation materially is conducive towards it. Falls very frequently produce it; various kinds of injuries, particularly in the pelvic region." The post mortem (autopsy) on deceased was negative as to all parts of the body "except formed clot in the pulmonary artery." At the close of the post mortem was the following: "Cause of death: (1) Pulmonary embolism. (2) Fracture of left femur." The coroner's verdict as to cause of death was the same as shown in the post mortem. In the answer filed by appellant is the following: "Did injury result in death? Yes. Parts of body injured? Intracapsular fracture of left femur. Pulmonary embolism. Exact nature of any permanent injury? Death." We rule that there was substantial evidence that the injury sustained in the fall was the cause or was a contributing cause to the formation of the embolism. Morrow v. Orscheln Bros. Truck Lines, 235 Mo. App. 1166, 151 S. W. (2d) 138, l. c. 147 (13); Schroeder v. Western Union Telegraph Co. (Mo. App.), 129 S. W. (2d) 917, l. c. 923 (11); Waterous v. Columbian National Life Ins. Co., 353 Mo. 1093, 186 S. W. (2d) 456, l. c. 459 (2-4).

The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.