**FOSTER**

v.

**AINES FARM DAIRY CO. et al.**

No. 43542.

Supreme Court of Missouri.

Division No. 1.

Dec. 14, 1953.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 11, 1954.

422

Marcy K. Brown, Jr., Ben E. Pener, Kansas City, for appellants.

R. Robert Cohn, Kansas City, for respondents.

VAN OSDOL, Commissioner.

This is a workmen's compensation case.

Iley Johnson, employee of Aines Farm Dairy Company, was fatally wounded by a knife in the hand of one Frank Boyce in an encounter at a store on Guinotte Street in Kansas City, December 29, 1949. The employee was survived by his wife and four minor children. The employee's widow, Frances Johnson, qualified as guardian of the children in the Probate Court of Johnson County, Kansas, and filed claim for·

compensation as employee's widow and as guardian. And Dortha Foster, sister of employee, qualified in the Probate Court of Jackson County as curatrix of the estates of the minor children and filed claim for compensation on the theory that the employee's widow was entitled to compensation. See Section 287.240 RSMo 1949, V.A.M.S.; Beecham v. Greenlease (Cadillac) Motor Co., 225 Mo.App. 619, 38 S.W.2d 535.

Both claimants introduced evidence in support of their claims before a referee of the Industrial Commission (Workmen's Compensation Division). The referee, and the Commission upon review, found from all of the evidence that the death of the employee was not the result of an accident arising out of and in the course of his employment. The Commission entered a final award denying compensation; and upon appeal the Circuit Court of Jackson County in turn entered judgment denying compensation. Claimant Dortha Foster, curatrix, has appealed. Claimant Frances Johnson, widow and guardian, did not appeal.

■ This court has appellate jurisdiction of the case on the ground of the "amount in dispute." The compensation in death benefits, if awarded in the instant case, would be in excess of $7,500. Const. Art. 5, § 3, V.A.M.S.; Section 287.240, supra; Lardge v. Concrete Products Mfg. Co., Mo. Sup., 251 S.W.2d 49.

■ In reviewing this workmen's compensation case we have the duty of determining whether the Commission's award is supported by competent and substantial evidence upon the whole record. Const. Art. 5, § 22, V.A.M.S. This does not mean that we may substitute our own judgment on the evidence for that of the Commission. But we are authorized to decide whether the Commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner

Electric Corporation, 355 Mo. 670, 197 S.W. 2d 647.

■ It is thought that no all-embracing definition of the phrase "arising out of and in the course of his employment" has yet been framed. Every case involving the phrase "should be decided upon its own particular facts and circumstances and not by reference to some formula." Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S.W. 2d 601, 605; Finley v. St. Louis Smelting & Refining Co., Mo.Sup., 233 S.W.2d 725; Goetz v. J. D. Carson Co., 357 Mo. 125, 206 S.W.2d 530; Lardge v. Concrete Products Mfg. Co., supra; Section 287.120 RSMo 1949, V.A.M.S. But it has been said that an injury arises "out of" the employment when there is causal connection between the conditions under which the work is required to be performed and the resulting injury (and that an injury to an employee arises "in the course of" his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto). Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S.W.2d 128. See also Fowler v. Baalmann, 361 Mo. 204, 234 S.W.2d 11; Morgan v. Duncan, 361 Mo. 683, 236 S.W.2d 281; Goetz v. J. D. Carson Co., supra; Tabor v. Midland Flour Milling Co., 237 Mo.App. 392, 168 S.W.2d 458.

Was Commission's determination that the fatal injury was not the result of an "accident arising out of and in the course of" the employment supported by substantial and competent evidence upon the whole record?

As stated, Iley Johnson, employee, was employed by respondent-employer Aines Farm Dairy Company. He was the driver of employer's truck in making wholesale milk deliveries to stores including the store on Guinotte where employee was fatally wounded and which store was until the day, December 28th, preceding his death, December 29th, owned by employee and his brother-in-law Raymond Foster, husband of

claimant-appellant Dortha. The store was on employee's regular milk delivery route. The store had been purchased by employee and Foster September 15, 1949; and Frank Boyce and employee's wife, Frances, were put in charge, and were conducting the business until the day employee was killed.

There was evidence tending to show that in 1949 employee, Iley Johnson, had lived with his wife, Frances, and their four minor children on a farm in Kansas. Boyce had lived with the Johnsons in their home for one or two years prior to the purchase of the store on Guinotte in September 1949. As we have said, when the store was purchased by Johnson and Foster, Boyce and Johnson's wife were put in charge. In about thirty days domestic troubles developed, and a few days later the Johnsons separated. Employee's wife left the Kansas home and lived with Boyce at hotels and apartments in Kansas City. However, employee's wife and Boyce continued to run the store. Employee's widow, claimant Frances, testified there was no friction because of this anomalous situation—"there was an understanding between all of us." Employee instituted an action for divorce in the District Court of Johnson County, Kansas, sometime in November. And the wife filed answer, apparently on December 28, 1949. After employee had instituted the divorce action there had been talk of a property settlement and, it seems, it was tentatively agreed that there would be no contest in the divorce case and that employee was to have the custody of the children. However, as stated, the wife filed answer on or about December 28th, the day preceding employee's death. In her answer, she prayed for a divorce, and asked for an equitable division of the property and the custody and control of the minor children.

Employer, Aines Farm Dairy Company, knew of employee's interest in the store. Employer had supplied the store with an "Aines" milk sign, and had also painted and supplied a "Johnson's Market" sign. However, it seems these courtesies were those employer gave to proprietors of all stores, patrons of employer. On "her own time" another employee of Aines "kept the books" for Johnson's Market. It was employee's duty, in "making his route," to deliver Aines milk products to the customer stores, "pick up" empty bottles, containers and, sometimes, the unused, spoiled products which had been delivered on preceding days, and to make collections for products delivered that day.

December 28th employee transferred his interest in the store to Foster, and it was planned that Foster was to come to the store at 9:00 o'clock the next morning and meet employee when he arrived to deliver milk. It had been arranged that employee was to advise Boyce and employee's wife of the transfer of employee's interest in the store and that Boyce "would have to get out if Foster said so."

Raymond Foster, witness for claimant Dortha Foster, testified, "I asked Johnson to tell them (Boyce and employee Johnson's wife) that he had sold his part to me. * * * He (employee) was supposed to go down there and tell them I had bought his part of the store and that they would have to leave." When Foster had arrived at the store, Boyce was standing by the cash register. Employee told Boyce of the transfer of employee's interest, and there was some further argument about the keys to an automobile which had been purchased by Boyce but the title to which was in employee. [Employee had said "he did not want Frank Boyce driving the car in his (employee's) name."] "Frank (Boyce) said he would strip him of everything he had." Frances "said the same thing." Employee "asked me to pay for the milk. * * * I started back to pay him * * * I opened the drawer and Frank Boyce was walking out with his hand in his coat pretending to have a gun, walking toward Johnson." Employee hit Boyce and Boyce went down, knocked a cooky rack over, and Johnson "hit him four or five times." Foster stopped the fight. Johnson was "straightening up his clothes * * * and Boyce went back towards the meat counter." Johnson asked Foster "to pay him (for the milk) so he could get out." Boyce got a butcher knife. "I (Foster) was walk-

ing back to pay Johnson for his milk when I met Frank with his knife." Johnson "was standing by the vegetable rack, waiting for me to pay him. He asked twice for me to pay for the milk." As Boyce approached, Johnson took up a light board from over the cooky rack and struck at Boyce. "Frank ducked * * * and the board hit him on the back. Then Boyce came up with the knife" and struck Johnson in the heart.

On cross-examination, counsel for respondents, employer and insurer, interrogated Foster concerning his signed written statement made, December 29th, to the police. The statement was received in evidence over the objection of both claimants. The statement was in part as follows,

"Yesterday, December 28th, 1949, I got a telephone call from Iley, asking me to meet him at the dairy. I went to the dairy * * * and met him about 2 o'clock in the afternoon. At that time he told me that he wanted to sign the grocery store over to me, that he was afraid he was going to have a little trouble and that if anything happened he wanted me to have the grocery store, or get my money out of it. We then went out of the dairy and contacted an attorney * * *. We then checked with Olathe and found out that Iley's wife had filed a cross suit for divorce. After this we had the attorney draw up the papers, naming me the sole owner of the grocery store * * *. We then made arrangements whereby I was to meet him (Iley) at the grocery store this morning, December 29th, at 9 o'clock. We were going to tell Frank Boyce and Frances Johnson that I had bought his share of the store and that they would have to turn over all of the money to me, and that I was going to run the store myself and they would have to leave. He also told me that he was going to get the keys for his car, the car being in his name. * * *

"This morning just before 9 o'clock I met Iley on Independence Avenue at Chestnut. We talked a few minutes about whether he should take the car keys, but he told me that this boy was a pretty bad actor and he might get into some trouble with the car and that he, Iley, would be blamed for it. He told me that if he was going to let them keep it he would get it signed over in Frank's name. Iley then drove his milk truck down to the grocery store and I followed him in my truck. When we got to the store Iley parked in front, went in and delivered their milk and came back out and put the empties into his truck. When I saw him do this I then went over to the store and went inside with him.

"When we first went into the store there was a Grennan Cake man in there putting some cake on the shelves. Iley paid him off and told him that he better get on outside as they had a little argument to settle. There was also a customer in the store who wanted some hamburger. Iley told him to go on out and come back later. After these two people left the store Iley went over and locked the door. After Iley locked the door Frances came out of the back room to the front of the store. Iley told Frank and Frances that I was the owner of the store, that he had sold me his share. He told them that I was taking over at 9 o'clock and that they would have to leave all of the store money in the cash register. Frank went over toward the cash register and said that some of the money in the register belonged to his mother and put his hand out as if to open it. Iley went over and placed his hand on the register, and told Frank to leave it alone. Frances then came up and she told Iley that he was making a mistake in selling the store. Iley then asked Frank for the keys to the car. Frank refused to give them to him and Iley grabbed him and hit him in the face and knocked him back into a stand, which broke and scattered some cookies and bottled goods on the floor. When Frank hit this stand he then fell to the floor and

Iley jumped on him and started beating him and told him he wanted those car keys and was going to get them. I then went over and pulled Iley off of Frank and told him that he had done enough and to leave him alone. When Frank got off the floor he immediately went back to the meat block behind the meat counter, picked up a large butcher knife and came walking toward me and I told him not to use the knife and he told me to get out of the way, and walked over to Iley. Iley picked up a small board, which I *then* (sic) was part of the stand that Frank had fallen on and broken, and hit Frank with it. Frank then went over and stabbed Iley once right near the heart."

Claimant Frances Johnson testified that she and Boyce went to the store at about six o'clock in the morning of December 29th. She prepared breakfast for herself and Boyce. She remained in the back room of the store. Johnson came to the store around nine o'clock. He delivered milk and took out the empties. When he came back, Foster was not far behind. Witness thought she saw Johnson figuring the milk bill. She could not say who started the conversation. She heard Iley raise his voice, and she came "up front. I knew something was wrong." She heard the car and keys mentioned, but did not "know what they were arguing about when I came up. It happened just that quick. I went out the door to get help. * * * He got killed just that quick." She went to call the police. She had unlocked the door as she went out of the store.

Over claimants' objections the signed statement made by Frances Johnson to the police on December 29th was admitted into evidence. The statement was in part as follows,

"A few minutes before 7:00 o'clock, this morning, Frank and I left our hotel and drove in my car, to the City Market and got some supplies for the store. We then went on out to the grocery store * * *, which we call Johnson's Market, arriving there at approximately 8:00 a.m. After we got to the store, I went to the back room and started getting some breakfast ready, and Frank stayed in the front and was getting the store cleaned up for the day. While we were doing this, Iley came into the store to leave the day's supply of milk. I didn't come out of the back room where I was cooking breakfast, but I could look out and see Iley leaving the milk, and then picking up his empties and going back out to the truck. After being out there for a few minutes, he came back in the store and Raymond Foster came in behind him. I heard Iley tell Frank to get his coat and get out, that that was all for him. When I heard Iley tell Frank this, I came on up to the front of the store. Iley saw me and he told me to get on out too. Iley then told Frank he had better wait for just a minute and told Mr. Rose, who is a customer in the store, that he had better leave, and come back later. Iley then told Frank that there had better be so much money in the cash register, that he had put that much in and wanted to get it out. He also locked the front door, just before he mentioned the cash register. Frank had the keys to my car, which is in Iley's name, and which was parked in the driveway on the west side of the grocery store. Frank would not give them to him, and told Iley that I had the car keys. Frank and Iley then got into a small argument and I saw Iley reach over and grab hold of Frank and hit Frank over the right eye. Frank fell back into a small stand where we had some pastry and bottles, knocked this stand over, and Frank fell to the floor. Iley then fell down on top of him and about this time, I unlocked the front door and ran across the street to the tavern and called the police."

Both claimants introduced the deposition of Frank Boyce who testified that Johnson appeared at the store the morning of December 29th. He brought in some milk. He picked up some empties and took them

out of the store. He returned and laid the bill for the milk on the counter. At that time he told the witness Boyce of the change in the ownership of the store and that "I could get my stuff and get out of there. * * * Well, as I started to get my coat and hat, he came behind the counter and opened the cash register and said he would get his money (for the milk bill) himself. * * * We got into an argument. I told him I had $200 of my money in there and for him to keep his fingers out of it * * * he told me to stay away from it, he was running that register. * * *" Johnson said he was going to call the police, and Boyce told him not to stand there like a big idiot, but to call the police. Johnson hit Boyce in the mouth, Boyce countered, and "we hit the floor together." Boyce got loose and ran behind the meat counter and got a butcher knife. Johnson said, "You haven't had enough yet." Foster picked up a table and was blocking the way to the front door. Johnson grabbed the table, raised it over his head, and hit Boyce "across the forehead and arm and impaled himself on the knife, which I was holding out in front of me."

Likewise the signed statement of Boyce to the police, December 29th, was admitted into evidence over claimants' objection. The statement contained the following,

"Yes, Mr. Johnson came to the store and notified Mrs. Johnson and myself that his brother in law, Mr. Raymond Foster, was taking over management of the store. That we should gather up our clothes and belongings and leave, which we proceeded to do. I told Mr. Johnson that I had two hundred dollars which I had borrowed to cash checks, from my mother, in the register, which he refused to give, and told me to leave the store. I got my hat and coat and started to leave. Mr. Johnson asked for the keys to an automobile which is in his name but which I bought with money which I borrowed also, from my mother. I refused to give him the keys. As I tried to leave, he locked the door, and as I tried to

get out the door, he struck me, knocked me to the floor, and proceeded to put numerous blows around my head. At about this time, I heard Mrs. Johnson tell him to stop, as she was opening the door. She ran out and called the police. Mr. Foster was asked, also, to stop him, but didn't do so. * * *

"When Mr. Johnson got up * * * I picked up my hat and told him that I was leaving the store. He said that I wasn't going no place and said, 'You haven't gotten enough yet.' * * *

"Well, as I started toward the door, he started toward me again. I turned and ran to the butcher block and got a knife."

■ We attend the contention of appellant that the signed statements to the police made by Raymond Foster, Frances Johnson and Frank Boyce were hearsay and erroneously admitted into evidence. The contention is ruled adversely to appellant. It is true that prior contradictory or inconsistent extrajudicial statements of witnesses (in this case Frances Johnson was a party) are hearsay and not admissible as proof of the facts stated. The contradictory statements of witnesses are to be admitted only for the purposes of impeachment. Impeaching "evidence is not evidence of the fact touching which the witness is sought to be impeached. It is only the admission of parties which is evidence of the facts admitted." Short v. Bohle, 64 Mo.App. 242; Hammond v. Schuermann Building & Realty Co., 352 Mo. 418, 177 S.W.2d 618. In the instant case the written statements of the witnesses disclose inconsistencies with the testimony of the witnesses before Commission's referee. These inconsistencies were upon facts material to the issue. The inconsistencies were with respect to the origin and progress of the altercation and encounter. The statements make no mention of the milk bill or of any request for the payment of a milk bill, and are definitely inconsistent with the testimony of the witnesses before the referee to the effect that employee had withdrawn from the encounter and was

remaining in the store because he had not been paid for the milk. In other words, the statements would justify the trier of facts in disbelieving the testimony of the witnesses that employee had requested the payment of the milk bill, or had withdrawn from the fray but remained because he had requested and was awaiting payment of the bill. The cross-examiner was not unfair to the witnesses when examining them with reference to their statements. Prior to the introduction of his statement into evidence, the witness Foster was tendered the exhibit, his purported statement, and asked if he cared to read it. He identified the statement and his signature thereto. Likewise the exhibit, statement of Frances Johnson, was handed to her. She identified her signature. She read the statement and said it was correct. And the witness Boyce was tendered his purported statement. He identified the statement and his signature. He did not wish to read it.

■ Addressing ourselves again to the evidence as a whole—surely from our statement of the evidence (which statement, we believe, fairly and sufficiently reflects the effect of the evidence disclosed by the whole transcript of the evidence) it could be reasonably found that the origin and cause of the quarrel which developed into the fatal assault was in the personal affairs of the parties involved and present at the time and place.

■ It has been written that, "when the assault is unconnected with the employment, or is for reasons personal to the assailant and the one assaulted, or is not because the relation of employer and employee exists, and the employment is not the cause, though it may be the occasion, of the wrongful act, and may give a convenient opportunity for its execution, it is ordinarily held that the injury does not arise out of the employment." 58 Am.Jur., Workmen's Compensation, § 265, p. 765 at page 766.

In Keithley v. Stone & Webster Engineering Corporation, 226 Mo.App. 1122, 49 S.W.2d 296, cited by claimant-appellant, the controversy inducing the assault was connected with and pertained to the employment. There was no evidence of any other foundation for the quarrel. In Wamhoff v. Wagner Elec. Co., 354 Mo. 711, 190 S.W.2d 915, 161 A.L.R. 1454, the employee was doing work for his own benefit which activity was encouraged by the employer and to the employer's benefit. In Sweeney v. Sweeney Tire Stores Co., 227 Mo.App. 93, 49 S.W.2d 205, claimant's decedent had been instantly killed by a robber while protecting his employer's property. Under the facts, the employee's protection and preservation of employer's property was incidental to his employment. In Penker Const. Co. v. Cardillo, 73 App.D.C. 168, 118 F.2d 14, the employment provided the motive for the assault. In Tabor v. Midland Flour Milling Co., supra, in Blaine v. Huttig Sash & Door Co., 232 Mo.App. 870, 105 S.W.2d 946, and in Gillmore v. Ring Const. Co., 227 Mo.App. 1217, 61 S.W.2d 764, employees were injured by other employees in "horseplay." The case of Kaiser v. Reardon Co., 355 Mo. 157, 195 S.W.2d 477, does not support claimant's claim. Claimant-appellant has cited many other cases all distinguishable on the facts from our case. Having examined these cases we again say we think no all-embracing definition of the phrase "arising out of and in the course of his employment" has yet been found. Every case involving the phrase "should be decided upon its own particular facts and circumstances and not by reference to some formula." Leilich v. Chevrolet Motor Co., supra.

In the case of Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 112 F.2d 11, 16, cited by claimant-appellant, wherein compensation was allowed for the malicious assault of one employee on another, the reviewing court rejected "the test of immediate relevancy of the culminating incident." In that case the "culminating incident" was a name-calling quarrel and assault. The court recognized that work places men under strains and fatigue from human and mechanical im-

pacts, creating frictions which explode in myriads of ways, only some of which are immediately relevant to their tasks. Personal animosities are created by working together on the assembly line or in traffic. Others initiated outside the job are magnified to the breaking point by its compelled contacts. No worker is immune to these pressures and impacts upon temperament. They accumulate and explode over incidents trivial and important, personal and official. But the explosion point is merely the culmination of the antecedent pressures. That it is not relevant to the immediate task, involves a lapse from duty, or contains an element of volition or illegality does not disconnect it from them nor nullify their causal effect in producing the injurious consequences. "The limitation, of course, is that the accumulated pressures must be attributable in substantial part to the working environment. This implies that their causal effect shall not be overpowered and nullified by influences originating entirely outside the working relation and not substantially magnified by it. Whether such influences have annulling effect upon those of the environment ordinarily is the crucial issue."

The facts of our case are unlike those of the Cardillo case (and in Lardge v. Concrete Products Mfg. Co., supra, this court announced it could not accept the broad view expressed in the Cardillo case), yet the language of the reviewing court in the Cardillo case in treating with the play and interplay and causal effect of frictions engendered within and without the employment is, in a way, applicable in converse to the facts of our case. The language peculiarly supports the Commission's findings and award denying compensation upon the whole record of the instant case.

While it is quite clear in our case that employee's work as employer's milk deliveryman brought him to the scene of the tragedy; that one of his duties was to make collection for the milk delivered; that at the time of the fatal physical encounter he had made no collection; and that evidence was introduced tending to show that just prior to and during an interim in the progress of the encounter employee had asked payment for the milk delivered, yet, in our case, certainly there were substantial evidentiary bases for the belief the employee and Boyce, and others present at the scene of the tragedy, had personal, family and business relationships, other than those due to employee's employment. Pecuniary, personal and family interests, and desires, some illicit, were in conflict. Personal hatred and jealousies had been engendered and aroused in the actors by their contacts in these extrinsic relationships. These conflicts of interests, and these impelling animosities, had no relation to or origin in employee's employment. From the whole record, independently of the statements introduced in impeachment, it would be reasonable to say they were antecedent to, culminated into action at the time of employee's arrival at the store in the course of his employment, and caused the quarrel or altercation and encounter resulting in the fatal injury, but were not in any way due to the employment.

The judgment should be affirmed.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.