Oscar BLAIR, Respondent,

v.

ARMOUR and COMPANY, a corporation,
Appellant.

No. 22610.

Kansas City Court of Appeals.

Missouri.

June 3, 1957.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for appellant.

Randolph & Randolph, Lewis F. Randolph, Jr., St. Joseph, for respondent.

CAVE, Judge.

This is a workmen's compensation case. It is an appeal by the employer, Armour and Company, from a judgment of the Circuit Court of Buchanan County affirming the final award of the Industrial Commission in favor of the employee, Oscar Blair, in the sum of $4,130.

For convenience, the claimant, Blair, will hereafter be referred to as the "employee"; Armour and Company as the "employer"; and the Division of Workmen's Compensation as the "commission".

The employee filed claim before the commission for compensation for the loss of his right eye as the result of an accident allegedly arising out of and in the course of his employment. The claim was heard by a referee who found that the employee sustained "an accident on May 24, 1954 * * *, but that said accident was not an incident of nor did it arise out of and in the course of his employment * * *. I further find that the condition complained of, * * * the loss of the total sight and the removal of the right eye, was not the direct result of the alleged accident, * * *. Therefore, compensation must be * * * denied".

Employee filed application for review by the commission and the findings and award of the referee were reversed. The commission found that the employee sustained an accident arising out of and in the course of his employment; that as a result thereof, his right eye was removed; that the eye was sightless at the time of the accident; that under Section 287.190, RSMo 1949, V.A.M.S., the loss of a totally sightless eye is compensable; and awarded employee $35 per week for 118 weeks.

The employer appealed to the circuit court, which affirmed the findings and award

of the commission, and appeal was perfected to this court.

Employer's first contention is that the commission and the court erred in holding that the accident arose out of and in the course of the employment. The basis of this contention is that the evidence clearly establishes that the claimant arrived on the employer's premises and suffered the injury approximately two hours before he was required to report for work; consequently, the accident did not arise out of and in the course of his employment. We shall review the evidence relative to this contention.

The employee was a "utility butcher" working in the "cattle kill" department and had been so employed for many years. His duties required him to be available at all times during working hours to take the place of "regular butchers" while any one of them left his work to "grind his knives" or for other purposes. All butchers were required to have sharp knives and to do their own sharpening. The employer supplied the knives and maintained electric grindstones in its plant for use by the employees. Employee received an injury to his right eye while grinding his knives. These general facts are not in dispute.

Relative to the time of his arrival on the day of the accident, the employee testified that he was due to go to work at 6:30 A. M., "but I always get there in time to grind my knife, so, I won't have to do it before I let the guys out to grind theirs. * * * I get there about 4:30 or 5:30". On cross examination, he testified that a Miss Adams was the nurse employed by the employer, and that after the accident he went to her office at about 6:20.

"Q. You told her you came to work at 4:00 o'clock? A. Yes, sir, I told her I hurt my eye shortly after 4:00 o'clock. * * * She asked me what time I got there, and I told her 4:00; and she asked me again and I told her 'I dressed, and, went upstairs, and went to work'.

"Q. Sometime after 4:00? A. Yes. * * *

"Q. You were not paid for any work prior to 6:30? A. No, sir; I don't think so. * * *"

He was required to punch a time clock when he went to work, and the employer's record shows that he punched the clock at 5:32 A.M. on the day of the accident. When asked whether he had punched the clock prior to the accident, he stated, "I think so; I think I had checked in, already." He testified that it required 10 or 15 minutes to sharpen each knife and that on the day in question he sharpened four.

"Q. Was the company aware of the fact that you ground your knives before you went to work? A. Well, we all do that; all of us.

"Q. That is not only you, but all the employees there do that before the time of work—sharpen their knives? A. Yes, sir; and, they are still doing it now. * * *

"Q. Were you allocated any time in which to sharpen your knives? A. Yes, sir, I could any time; yes, sir.

"Q. Did they give you a set time? A. No, sir."

He stated that the reason he had four knives was that he had to use a different knife on different parts of the carcass as it was processed.

Mr. Shewmaker, employment manager of the employer, testified with reference to employees arriving early for work:

" * * * it is a custom to get there early. We have a restaurant, and it is entirely possible he (employee) comes to eat breakfast.

"Q. They are required to have sharp knives? A. Well, yes, they are.

"Q. Are they given time to sharpen the knives? A. Yes.

"Q. And, each man is allocated time to do that? A. Yes, sir."

Such evidence establishes that the employee was sharpening his knives, when injured, on the employer's premises and with the machinery provided for that purpose; that sharp knives were essential to properly do the work required of the employee; and that the employer would benefit from the work employee was doing at the time of his injury. On this feature of the case the opinion in Wamhoff v. Wagner Electric Corp., 354 Mo. 711, 190 S.W.2d 915, 919, 161 A.L.R. 1454, quotes with approval this general rule: "An injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is usually compensable, for when some advantage to the employer results from the employee's conduct, his act cannot be regarded as purely personal and wholly unrelated to the employment. Accordingly an injury resulting from such an act arises out of and in the course of the employment; and this rule is applicable even though the advantage to the employer is slight".

With reference to the time of his arrival, the employee speaks of it as being shortly after 4:00 A.M., and at another time as 4:30, and again as 5:30. *The exact time of his arrival is not the decisive fact issue. The vital question is what he was doing at the time of his injury and how long that was prior to the time he was required to go to work.* It is perfectly clear he was performing a necessary and required service for the employer at the time of his injury. The most specific and reliable evidence of his presence on the premises and the performance of service is the time he punched the clock, which was 5:32 A.M.; and he testified that in his opinion the accident occurred after that time. If so, this would be one hour before the required starting time. Certainly the commission could so find.

We are not cited to any Missouri case, and we find none, specifically discussing

or deciding the time of arrival element presented in this case. The employer cites cases announcing the general rule that the burden is on the claimant to show that the accident arose out of and in the course of his employment; Francis v. Sam Miller Motors, Mo., 282 S.W.2d 5; that each case involving this question must be determined by its own peculiar facts and circumstances and not by reference to some formula; Lunn v. Columbian Steel Tank Co., 364 Mo. 1241, 275 S.W.2d 298; and that the mere presence of an employee at a place of employment does not raise the presumption that the accident arose out of and in the course of his employment; De Moss v. Evens & Howard Fire Brick Co., 225 Mo. App. 473, 37 S.W.2d 961. These and other similar cases announce well established rules of law in compensation cases, but they are not decisive of the issue under discussion.

This question has been before the courts of other jurisdictions, and we shall consider such outside authorities.

In Larson's Workmen's Compensation Law, Vol. 1, Sec. 21.60, the general rule is announced that "The course of employment, for employees having a fixed time and place of work, embraces *a reasonable interval* before and after official working hours while the employee is on the premises engaged in preparatory or incidental acts, * * *. The rule is not limited to activities that are absolutely necessary; it is sufficient if they can be said to be reasonably incidental to the work." (Italics supplied.)

In Reese v. Pennsylvania R. Co., 118 Pa. Super. 112, 180 A. 188, 190, it is said: "What is a reasonable time for the employee to be upon the premises prior to the beginning of his day's task is a relative one, depending upon the circumstances of the case, and cannot be measured by a definite number of minutes in all cases." In that case, the employee came upon the premises "about an hour before the time that he was required to be there," and

under the facts it was held that he was entitled to compensation.

In Horn v. Fitler Co., 115 Pa.Super. 188, 175 A. 440, the court held that, under the facts, a claimant who was upon the premises an hour and a quarter before the plant was to begin its day's operation was entitled to recover.

In Carlin v. Coxe Bros. & Co., Inc., 274 Pa. 38, 117 A. 405, the court was discussing a situation where the employee, a night watchman, arrived on the premises about three hours before he was required to report for work. In holding that he was entitled to compensation, the court said (117 A. 405): " * * * an employee is required to be on the premises at his place of work a reasonable length of time before the hour fixed to commence his duties. What is a reasonable time depends on the character of the employment and the circumstances of each particular case, and is generally a question of fact for the compensation board. Ordinarily, this court will not disturb that conclusion except in plain cases where, as a matter of law, it may be determined the time was unreasonable. An employee, in performing his work honestly, has many small matters to look after about his place of work, such as collecting, inspecting, and arranging his tools, putting the place in proper order for work, and many other little acts facilitating his tasks later; this must require his presence before his actual labors begin".

In Kerwin v. Susquehanna Collieries Co., 112 Pa.Super. 594, 172 A. 24, 26, the court held that under the facts of that case the employee, who was hurt at least an hour and a half before he was due to work, could not recover because, "No sufficient reason was given by him for being there at that time". In the instant case, the employee gave a sufficient reason for being on the premises, and stated that the employer knew of the practice of the "butchers" arriving early to sharpen their knives and be prepared for the day's work.

In Sheridan v. Glen Alden Coal Co., 160 Pa.Super. 115, 50 A.2d 540, the question at issue was whether the accident occurred on the premises of the employer, and the court held it did not, and denied compensation. Cases discussing a factual situation where the accident occurred *off the premises* are of little or no help in reaching a conclusion on the question we are now discussing. In Stornant v. Licari-Packard Inc., 332 Mich. 210, 50 N.W.2d 762, 764, the court was discussing a situation where the employee had completed his work and was on his way to his automobile when he was injured, and announced this well recognized rule: "An injury to an employee while merely on his way to or from work without any causal connection between his injury and his work and without any duty to perform at that time for the employer does not 'arise out of and in course of [his] employment' ". That principle has no application in the instant case.

■■ The employer also cites McCampbell v. Benevolent P.O.E., 71 Ariz. 244, 226 P.2d 147. The time of arrival on the premises was not in issue in that case and we do not see its relevancy. Also cited is Crawley v. T. G. Griggs Trucking Co., 225 S.C. 154, 81 S.E.2d 41. In that case, the claimant was burned to death while sleeping in his automobile on the employer's premises. He was not performing any service for the employer. The employer also cites Jackson v. Lumberman's Mutual Casualty Co., 33 Ga.App. 35, 125 S.E. 515. In that case, the compensation commission found that the employee was injured on the employer's premises two hours before the time he was required to go to work. It does not appear what, if anything, the employee was doing at the time of his injury. Compensation was denied and the court merely upheld the award of the commission because there was sufficient evidence to support it. In our case, the commission has allowed compensation and if there is substantial evidence to support such allowance, we should affirm the action. We review the whole record, including the legitimate inferences to be drawn therefrom, in the light most favorable to the award of the commission, and then determine whether the commission's findings, if supported by competent and substantial evidence, are contrary to the overwhelming weight of the evidence. Damore v. Encyclopedia Americana, Mo., 290 S.W.2d 105, 108.

■■ The weight of authority is to the effect that if an employee goes upon the premises of the employer a *reasonable time* before he is to begin his day's work and is performing acts which have a causal connection with his duties and from which the employer will benefit, and is injured while so engaged, he is entitled to recover compensation. What is a *reasonable time* depends upon the facts of each particular case; what is necessary to be done in preparation for the day's work. In the instant case it was the custom and practice of the "butchers" to arrive early and prepare their tools, which were supplied by the employer for their regular work, and the employer knew of this practice. The employee testified that it required from 10 to 15 minutes to properly sharpen each knife, and that he had prepared three or four at the time of his injury. Whether he had arrived on the premises at 4:00, or 5:00 or 5:30, the commission could find that the accident occurred after he punched the time clock at 5:32. If so, we are unwilling to say, as a matter of law, that the accident did not arise out of and in the course of his employment.

It is next contended that there is no substantial evidence to support the finding of the commission that the enucleation of employee's eye was caused by the accident. The commission found that employee's right eye was sightless at the time of the accident, but that finding is not of great importance in determining whether the accident caused the removal of the eye. About 25 years prior to the time of the accident under consideration, employee suffered an injury to his right eye, and in 1943, he had consulted

Dr. Minton who found there was very limited sight in the eye; he visited Dr. Minton again in 1945, in 1951, and again in 1953, at which time Dr. Minton found that the sight was completely gone. As a result of the present accident Dr. Minton removed a foreign substance from the eye and found it inflamed, and that "he had blood, again, in the right eye. It is not uncommon to have these old blind eyes flare up from any little particles". Dr. Minton treated the employee 18 or 20 times for this injury. About this time, employee took his vacation and went to California, and while there, the eye became inflamed and painful, and he consulted the employer's doctor out there. When he returned, he reported this fact to Dr. Minton, and shortly thereafter the eye was removed. Dr. Minton gave employee permission to go to California because he thought the eye had cleared sufficiently. Relative to employee's condition when he returned from California, the doctor said:

"Q. And, it was bad then, and it continued to be bad until you took the eye out? A. I would say it was irritated; but, not like it had been.

"Q. I presume you gave him some kind of sustenance to cut down the *inflamation* in it? A. We tried everything. * * *

"Q. The removal of the right eye was done because of the infection and *inflamation*? A. It became painful at several times. * * * He was about clear before he left—before he left for California.

"Q. Wasn't he still complaining to you about the right eye and was hesitant about going on the trip because it was still bothering him? A. The blood had quickly absorbed in the chamber, and I thought he could."

The employee testified that his eye had not cleared up, although some better when he left for California, but while out there it became inflamed and very painful, and that he consulted the employer's California doc-

tor and returned to Missouri and reported to Dr. Minton, and it was decided to have the operation. He also testified that he did not receive an injury to the eye while on the trip to California; and that after his return, Mr. Halsey, personnel director of the employer, suggested that the eye be removed.

■ Dr. Tropp, an osteopath, had treated employee at various times, and in answer to a hypothetical question, gave it as his opinion that it was reasonably probable that the injury made it necessary to remove the eye. The employer vigorously assails the qualification and evidence of Dr. Tropp, and the record justifies some criticism, but we are unwilling to say that his evidence is of no probative value. It is not for this court to say what its findings might have been had we originally heard the testimony. We are limited to determining whether the findings of the commission were supported by competent and substantial evidence, and were not against the overwhelming weight of the evidence.

■ We hold that there was sufficient evidence for the commission to find that the accident was the cause, or certainly a contributing cause, of the removal of the eye. Stephens v. Spuck Iron & Foundry Co., 358 Mo. 372, 214 S.W.2d 534, 539.

The next, and most perplexing question is, what compensation, if any, should be awarded for the removal of a sightless eye under Section 287.190? The attorneys are to be commended for the tremendous amount of research they have done in collecting and analyzing scores of decisions of other states on this question. They concede the specific issue has never been decided in this state. We have studied the cases cited and are convinced that there is little hope of harmonizing the authorities. This is primarily due to the differences in the provisions of the various compensation statutes. For a general discussion of eye injuries, see 58 Am.Jur. page 784, Sec. 290; 73 A.L.R. page 702 et seq.; 142 A.L.R. page

822 et seq.; Florida Game & Fresh Water Fish Comm. v. Driggers, Fla., 65 So.2d 723; Kraushar v. Cummins Const. Co., 180 Md. 486, 25 A.2d 439; McCadden v. West End Building & Loan Ass'n, 18 N.J.Misc. 395, 13 A.2d 665. There are many other cases, but these will give an overall picture of this complex question.

Our statute, Section 287.190, subd. 1, provides compensation for a certain number of weeks for the *"loss"* of 46 separate members or parts of the body, such as the arm, leg, hand, foot, etc. Item (43) provides for "complete loss of one eye 118 weeks"; Item (44) for "complete loss of the sight of one eye, 108 weeks". We are of the opinion that Items (43) and (44) are two separate and distinct injuries; and that Item (43) means the *loss by removal of the organ itself*.

This section also provides in Paragraph 2, "The total, permanent loss of the use of an arm, hand, thumb, finger, leg, foot, toe or phalange shall be considered as the equivalent of the loss by separation of the arm, hand, thumb, finger, leg, foot, toe or phalange and compensation shall be paid for the same period as for the loss thereof by separation". It is significant that the *loss* of an *"eye"* or the *"sight"* thereof is not included in this provision.

Some courts have construed statutes similar to ours to mean that the loss of one of the specified items is to be considered as the loss of a member of the body and its prior efficiency is not decisive of the compensation to be allowed. The following cases have allowed full compensation for the loss of a sightless eye on that theory: Shaughnessy v. Diamond Iron Works, 166 Minn. 506, 208 N.W. 188; Mosgaard v. Minneapolis Street Ry. Co., 161 Minn. 318, 201 N.W. 545; Riegle v. Fordon, 273 App.Div. 213, 76 N.Y.S.2d 523, affirmed 298 N.Y. 560, 81 N.E.2d 101; Redman v. Iaculli, 273 App. Div. 835, 76 N.Y.S.2d 525; McKenzie v. Gulf Hills Hotel, Inc., 221 Miss. 723, 74 So.2d 830; Hemphill v. Co-operative Refinery Ass'n, 174 Kan. 301, 255 P.2d 624;

Hessley v. Minneapolis Steel Const. Co., 156 Minn. 405, 195 N.W. 274.

The statutes of other states seem to fix the amount of compensation for the loss of a hand, foot, eye, etc., on the basis of the *disability* resulting therefrom. In other words, the lost member must have been of some use before compensation may be allowed for its loss. A review of many such cases is to be found in Florida Game & Fresh Water Fish Comm. v. Driggers, supra; Kraushar v. Cummins Const. Co., supra; McCadden v. West End Building & Loan Ass'n, supra; 73 A.L.R. and 143 A.L.R., supra.

In Rye v. Chevrolet Motor Co., 229 Mich. 39, 201 N.W. 226, the court held that in using the words "the loss of an eye", the legislature evidently intended the loss of the sight or vision of an eye, rather than the loss of the physical eye. To the same effect is the holding in London Guarantee & Accident Co. v. Industrial Commission, 76 Colo. 155, 230 P. 598. Neither of these cases cites a decision in support of the conclusion reached.

We will not undertake a review of all the authorities cited, but most, if not all of them, are to be found in the text and citations contained herein.

In Riegle v. Fordon, 273 App.Div. 213, 76 N.Y.S.2d 523, the court very aptly discusses the question before us. In that case, claimant's right eye was totally blind before the accident, and the employer contended that "since the eye was not a useful member no award could be made for its loss as a member". In disposing of this contention, the court said 76 N.Y.S.2d 524: "If the word 'useful' is to be interpolated it should be done by the Legislature. Moreover, * * most people would prefer to retain and not lose a natural eye even though the eye may be sightless. An artificial eye may well produce discomfort and irritations. And beyond this there usually remains with the average person the hope that the advancement of medical science may provide a way

for restoration of sight. These considerations should not be ignored by judicial interpolation".

The Kansas compensation statute—G.S. 1951 Supp. 44–510(3)—is very similar to ours. It provides: "(c) Where disability, partial in character but permanent in quality, results from the injury, the injured workman shall be entitled to the compensation * * *". Then follows a long list of members of the body; and Item (15) reads: "For the loss of an eye, *or* the complete loss of the sight thereof, sixty percent (60%) of the average weekly wages during one hundred ten (110) weeks". This statute provides in one loss schedule (15) the same conditions that our statute provides in two loss schedules, (43) and (44).

The Kansas statute was construed by the supreme court, in Hemphill v. Co-operative Refinery Ass'n, supra. The employee had suffered the removal of a sightless eye. The commission and the lower court awarded compensation for 110 weeks. In affirming the award, the court said (255 P.2d 626): "It (the statute) does not restrict recovery to the loss of a perfect or an impaired eye, and the use of the word 'or' would indicate the legislature had in mind the physical removal of an eye, even though defective or sightless, as well as the complete loss of the sight of an eye. Prior to the injury in question claimant was possessed of his left eye, even though it was sightless. He does not have it now. He has lost an eye!"

The Supreme Court of Mississippi discussed the same question in McKenzie v. Gulf Hills Hotel, Inc., supra. That was a claim for the loss of a sightless eye, and the court analyzed an array of decisions from other states, many of which are cited in the respective briefs herein. This statute, Sec. 6998-09(c), Miss. Code 1942, is similar to ours, and provides that the employee shall be paid compensation in a certain amount for the *loss* of "(5) eye—100 weeks". There are many other specific members listed in the section. In affirming the award for 100 weeks, the court said (74 So.2d 830): "The sole question presented is whether the loss of a sightless eye is covered by the Act. The legislature provided that an employee shall receive benefits for 100 weeks for the loss of an eye and it made no distinction between a good eye and a defective eye nor did it limit recovery to the loss of vision in an eye. The employee in this case has unquestionably lost an eye and under our declared policy of interpreting the statute favorably to the workman we cannot write into the act that it covers only the loss of vision for the act does not so provide. If it is to be so limited, that is a matter for the legislature and not for the courts". This case also quotes at considerable length from the opinion in McCadden v. West End Building & Loan Assn., 18 N.J. Misc. 395, 13 A.2d 665, 667, wherein that court reviewed many decisions and concluded by saying: "And similar has been the construction throughout the United States, though, of course, the variant statutory provisions must be borne in mind. The courts have there held, with but few exceptions, that the loss of a totally or partially sightless eye, constitutes the loss of an eye".

In Leach v. Grangeville Highway Dist., 55 Idaho 307, 41 P.2d 618, the court was discussing a situation where the employee had, in a prior accident, lost 90% of the vision of his eye, and had been paid therefor, but in a subsequent accident he suffered the removal of that eye. In allowing him full compensation, the court pointed out that the various compensation acts generally provide for two bases of compensation; one is on the theory of injuries which affect *disability* for work and the other for *specific indemnities* such as the loss of a hand, foot, eye, etc. Our statute seems to be drawn on that theory.

In Mosgaard v. Minneapolis St. Ry. Co., supra, the sole question discussed was whether the removal of a totally blind eye since childhood should be compensated under the Minnesota Act providing "For the loss of an eye, * * *". M.S.A. § 176.11. It was held that claimant was

entitled to full compensation. The court also discussed the possibility of inequalities due to double compensation in certain cases, and said, "But in the Hessley Case attention was called to the plain language of the act, which gives compensation for the loss of a member of the body without reference to ability of the member to perform its natural functions. In the application of this provision, inequalities in the manner of compensation cannot be avoided. Sometimes what is equivalent to double compensation will be made. * * * The inequalities are glaring, but, if they are to be removed, it must be by legislation".

We do not decide whether the removal of a totally useless hand, foot, leg, etc., as provided in Par. 2 of Section 287.190, should be compensated for, if compensation has been allowed for the original injury. This for the reason the "eye" is not included in that paragraph.

There are two recent cases that lend support to the employer's contention that compensation cannot be allowed for the removal of a sightless eye. These cases are: In re Green's Case, Mass., 139 N.E.2d 520; and Crown Woodworking Co. v. Goodwin, 100 N.H. 431, 128 A.2d 918. Both opinions are based upon the construction of the compensation statute in each state.

In Massachusetts the statute provided certain compensation "for the loss by enucleation or otherwise or the total loss of use of one eye". St.1949, c. 519, § 36(d). That statute also provided that in determining the amount of specific compensation payable under the Act, reduction of the vision to 20/70 of normal is considered as the equivalent of the removal or total loss of use of the eye. As pointed out above, our statute has no such proviso. In fact, the loss of an eye or the sight thereof is significantly missing in paragraph 2 of our statute quoted supra.

The New Hampshire statute provides compensation for "eye lost, one hundred eighteen weeks' * * *"; and a related subdivision provides, "compensation for loss of eighty per cent or more of the vision of an eye shall be the same as for the loss of an eye." RSA 281.26, subds. 12, 17. The court recognized the sharp conflict among the authorities on the question whether an employee is entitled to compensation for an "eye lost" in case of the removal of a totally sightless eye. Many decisions are cited and a majority, at least in number, support the conclusion that the removal of a sightless eye is compensable. However, the New Hampshire court held that the quoted provisions indicate a legislative determination to corelate *the loss of an eye with loss of its vision*; this, for the reason, "that compensation for the loss of eighty per cent or more of the vision of an eye shall be the same as for the loss of an eye, * * *". Our statute contains no such provision, but clearly indicates that the "loss of an eye" and the "loss of sight" are separate and distinct injuries.

The New Hampshire court also points out that its "second injury fund" statute does not govern the amount of compensation to be allowed under the section fixing compensation for certain specified injuries. We agree with that conclusion. Consequently, our "second injury fund" statute, Section 287.220, does not control the factual situation in the instant case.

The case of Beyer v. Department of Labor and Industries, 17 Wash.2d 29, 134 P.2d 948, 949, lends support to the employer's contention that the employee is not entitled to compensation for 118 weeks, but at most should be allowed compensation for 10 weeks, the difference between the allowance made by the statute for the "loss of an eye" and that made for the "loss of the sight of an eye". The Washington statute contained a compensation schedule including "loss of one eye by enucleation $1,440.00—loss of sight of one eye, $1,080.-00". Rem.Rev.Stat. § 7679. The employee had lost the sight of an eye and in a subsequent accident suffered the removal thereof. The commission allowed

the difference between the above amounts, or $360. On appeal, the circuit court awarded claimant the full amount, or $1,440. That judgment was reversed and the allowance of $360 was ordered reinstated. However, the court based its decision on a recent amendment of the statute which provided, "Should a workman receive an injury to a member or part of his body already from whatever cause permanently partially disabled, resulting in the amputation thereof or in an aggravation or increase in such permanent partial disability but not resulting in the permanent total disability of such workman, his compensation for such permanent partial disability shall be adjudged with regard to the previous disability of the injured member or part and the degree or extent of the aggravation or increase of disability thereof." Our statute contains no such provision.

This opinion is already too long. Further discussion of the array of cases cited in the briefs will only emphasize the divergent views of the courts in construing the various Compensation Acts under many factual situations.

We conclude that Section 287.190 arbitrarily fixes the compensation for the loss of various members of the body. The loss of an eye is in this category, and when the whole section is considered, it was not intended that the eye must have some efficiency.

From what we have said, it follows that the judgment should be and is hereby affirmed.

All concur.