THEOLA COOK
*vs.*
COLBY COLLEGE AND LIBERTY MUTUAL INSURANCE CO.

Kennebec.    Opinion, August 14, 1959

*Bird & Bird* for plaintiff.

*Robinson, Richardson & Leddy* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J.   This workmen's compensation case is before us on appeal from a pro forma decree in the Superior Court affirming the decision of the Industrial Accident Commission.

The issue is whether the Commission correctly held that the removal of an eye with 3 3/10% of normal vision resulting from a compensable accident was the "loss of an eye" within the schedule of injuries of Section 13 of the Workmen's Compensation Act entitling the claimant to compensation for presumed total incapacity for 100 weeks.

The facts are not in dispute.   The parties stipulated and agreed:

"- - - that on April 20, 1957, just prior to her accident the Petitioner had a vision of not more than 20/400 in the right eye that was injured.   This is three-and-three-tenths per cent vision or a loss of vision of 96.7 per cent.

"- - - that this amount of vision is much less than that needed for the capable performing of the ordinary functions of an eye.   Light perception such as the Petitioner had enabled her only to distinguish the movements of objects within a radius of five or six feet of her but she was not able to distinguish what the objects were.

"- - - that the Petitioner on April 20th, 1957, received an industrial accident to the right eyeball in question which necessitated its removal. . . "

We assume the parties intended to describe the permanent condition of the eye prior to the accident, and the extent of the vision "with glasses".

Without question, the claimant prior to the accident was practically blind in her right eye. The eye served no useful purpose to her in industry and was in the condition known as "industrial blindness".

The claimant has received compensation for her *actual* total incapacity from the date of the accident to her return to her regular work at regular pay, a period of ten weeks. All medical and hospital expenses, so far as is known to the Commission, have been paid by the employer or its insurers. These facts, however, have no bearing on the right to compensation for presumed total incapacity for 100 weeks if the injury comes within the schedule, except as the employer or insurance carrier may be entitled to credit for payments made.

No one belittles the severity of the injury to the claimant, or questions her right to compensation for actual total or partial incapacity. It should be noted, however, that there is no provision in our Act for an award for disfigurement.

The Workmen's Compensation Act (R. S. c. 31, § 13) reads:

> "Sec. 13. Compensation for specified injuries; permanent impairment. — In cases of injuries included in the following schedule the incapacity in each such case shall be deemed to be total for the period specified; and after such specified period, if there be a total or partial incapacity for work resulting from the injury, the employee shall receive compensation while such total or partial incapacity

continues under the provisions of sections 11 and 12 respectively. The specific periods during which compensation for presumed total incapacity is to be paid because of the injuries hereinafter specified shall be as follows: For the loss of a thumb, 50 weeks. (Provision for other members). For the loss of an eye, or the reduction of the sight of an eye, with glasses, to 1/10 of the normal vision, 100 weeks. (1)

For the total and permanent loss of hearing in one ear, 50 weeks.
\* \* \* \* \* \* \* \* \* \*
In all other cases of injury to the above-mentioned members or eyes where the usefulness of any physical function thereof is permanently impaired, the specific compensable periods for presumed total incapacity on account thereof shall bear such relation to the periods above specified as the percentage of permanent impairment due to the injury to such members or eyes shall bear to the total loss thereof; and the commission upon petition therefor by either party shall determine such percentage."

The position of the Commission is found in the findings and decision in these words:

"Did she have an eye to lose from a legal standpoint? . . . we find that she did have an eye prior to this accident and that as a result of this accident she lost it. The removal of her eye was a serious loss to her, as the sight which remained in that eye such as it was constituted a precious possession. It was admittedly not a good eye, but the law in question does not state the eye must be perfect, nor does it refer to any limitations for an impaired eye. The petitioner's eye was not entirely blind, sightless or dead. She could distinguish darkness from light and could get the shadow of

(1) This clause unchanged from original enactment of Workmen's Compensation Act in Laws 1915, c. 295, § 16, except addition of "or for diplopia" in Laws 1957, c. 252, since this case arose, and changes in amount.

objects within five or six feet from her and this we hold to be of value. She was also able to avoid the inconvenience, discomfort and cosmetic loss of wearing an artificial eye. She had a right to hope that with the advancement of medical science the sight in her eye might in the future be improved. The fact of being able to distinguish darkness from daylight had some value over a completely dead eye. The fact of being able to distinguish the shadow of objects within six feet of her, even though she could not tell what the objects were, we hold to be of some value from a safety standpoint and a value above and beyond that of a completely blind eye. In other words she had something of value present prior to this accident, and as a result of the accident she has lost it. She has sustained the 'loss of an eye.'"

We interpret the words "loss of an eye" in the scheduled injuries of Section 13 to mean the removal or enucleation of an eye useful in industry with at least 1/10 of normal vision, with glasses. In short, an eye in the condition of industrial blindness is not an "eye" within the schedule. It follows that the Commission erred in granting compensation for presumed total incapacity for a scheduled injury. In reaching this conclusion we are mindful of the legislative injunction that "In interpreting this act (the Commission) shall construe it liberally and with a view to carrying out its general purpose." R. S., c. 31, § 30.

The basic purpose of the Workmen's Compensation Act is to provide compensation for loss of earning capacity from actual or legally presumed incapacity to work arising from accidents in industry. *Fennessey's Case,* 120 Me. 251, 113 A. 302. "In compensation, unlike tort, the only injuries compensated for are those which produce disability and thereby presumably affect earning power." Larson, *Workmen's Compensation,* § 2.40.

The function of the eye is sight or vision. Without vision, or without any efficient vision, the eye as an organ serves no useful purpose. Loss of earning capacity comes from loss of use, not from loss in the sense of removal of the eye.

The Legislature has recognized that the real injury which the Workmen's Compensation Act is designed to meet is blindness from industrial accident, not removal or enucleation of the eye as such. In Section 13 the measure of presumed total incapacity is identical "for the loss of an eye, or the reduction of the sight of an eye, with glasses, to 1/10 of the normal vision, . . "

The theory of the scheduled injuries is that the claimant "has sustained a distinct loss of earning power in the near or not remote future." *Clark's Case,* 120 Me. 133, 137, 113 A. 51. Specified periods of presumed total incapacity designed to express the opinion of the Legislature upon the seriousness of the different types of loss are established, thereby facilitating the administration of the Act. Loss and loss of use of an eye to the extent noted are given equal weight, i.e., a presumed total incapacity of one hundred weeks, and thus are made equivalents.

"Loss" in the schedule means the severance or removal of a member, as a leg, or of an eye, and not loss of use from the partial or total permanent impairment of a leg or reduction in sight. The distinction between "loss" and "loss of use" has been maintained since the adoption of the Act. *Merchant's Case,* 118 Me. 96, 106 A. 117. Without doubt all scheduled injuries could be defined in terms of loss of use, but such has not been the history of the Act. Indeed, from 1915 to 1919 the only loss of use provisions in the schedule related to reduction of vision and loss of hearing.

In 1919 the Legislature first enacted the last paragraph of Section 13, *supra,* providing for periods of presumed

total incapacity proportionate to loss of use of members. Laws 1919, c. 238, § 16. The paragraph was amended in 1929 to include loss of use of the eye, thus covering a partial loss of use not reached by the scheduled item on reduction of vision. Laws 1929, c. 300, § 13. See *McLean's Case,* 119 Me. 322, 111 A. 383; *Clark's Case, supra.*

The relationship of *loss* to *loss of use* in terms of presumed total incapacity has thus been completely established since 1929. It is a further recognition that it is *loss of use,* not loss or removal in itself that brings about loss of earning capacity.

In the words "with glasses, to 1/10 of the normal vision," the Legislature adopted a reasonable standard of industrial blindness. In our view the Legislature intended thereby that "eye" under the schedule must be an eye useful in industry. Whether industrial blindness may be reached as a fact with more than 10% vision, is not in issue. The statute does no more than establish that an eye with 10% or less vision is legally industrially blind.

The present decision is foreshadowed in *Borello's Case,* 125 Me. 395, 134 A. 374. The employee suffered loss of all efficient vision of an eye which prior to the injury had 64% vision. It was urged unsuccessfully that the compensation under the schedule should be proportionate to the percentage of normal vision lost by the accident, or 64% of the specified compensation.

The court said, at p. 396:

"The compensation provided for in Section 16 (the schedule of injuries is now Section 13) of the Act is not necessarily based on the presumption that the injured workman previously had a normal arm, leg, hand, or eye. If he had an arm, leg, hand, or eye capable of performing the ordinary functions of such members, even though its normal efficiency was impaired, and as a result of an in-

jury the arm, leg, or hand is severed, or the sight of an eye is reduced to or below one tenth of the normal vision, he would be entitled to compensation for total incapacity for the specified period fixed in Section 16.

"What percentage of normal vision above one tenth, it is necessary for an employee to have, so that if reduced by injury to or below one tenth, he can be said, within the meaning of Section 16, to have lost an eye, it is not now necessary to determine.

"The Commission was clearly right in holding that a loss of all efficient vision of an eye, previously sixty-four per cent normal, entitled the petitioner to compensation as 'for the loss of an eye.' *Purchase* v. *G.R.R.*, 194 Mich., 103; *Hobestis* v. *Columbia Shirt Co.*, 186 N.Y., App. Div., 397."

On the facts *Borello's Case* involved loss of use or reduction in sight, and not the loss or removal of an eye. The interpretation of the scheduled injuries section by the court, although it is broader in scope than necessary for the decision, is entitled to great weight. For over three decades the interpretation has remained unchallenged in the courts. The court firmly determined that an eye within the schedule must have the capability of performing its ordinary function of sight and that an eye with 10% or less of normal vision with glasses was a lost eye. Usefulness in industry was accepted as the standard of eye under the schedule. Neither the removal of a totally blind eye nor the removal of an eye with vision useful to the individual but not in industry bring a case within "the loss of an eye" in the schedule.

On the view taken by the Commission, the door is open for double compensation under the scheduled injury section. Such a result is plainly contrary to the purpose and intent of workmen's compensation and does not flow from

the construction we place upon the section. We may illustrate with assumed injuries to an eye, either normal or defective, but useful in industry, as in *Borello's Case.* If such an eye is lost, i.e., removed in an industrial accident, the employee is entitled to compensation for presumed total incapacity of 100 weeks. No one would suggest that the employee should receive additional compensation under the schedule for reduction in vision. Loss in this case obviously includes loss of use.

In the event of two accidents, the first resulting in loss of sight to, say 3% plus vision as here, and the second resulting in enucleation, the claimant on the Commission's theory would be entitled to 200 weeks of presumed total incapacity. The Legislature in our view did not intend such a result.

The reason for claimant's reduction in sight to the injured eye to below 10% of vision is neither given in the record nor is it material. The decisive factor in applying the scheduled injury section was the condition of the eye at the time of the accident. See *Lawson* v. *Suwanee Fruit & Steamship Co.,* 336 U. S. 198, 69 S. Ct. 503.

The cases on removal of an eye under a scheduled injury cannot be reconciled. Compensation has been awarded for removal of a sightless eye in *Riegle* v. *Fordon,* 273 App. Div. 213, 76 N.Y.S. (2nd) 523, affirmed 298 N.Y. 560, 81 N.E. (2nd) 101; *McKenzie* v. *Gulf Hills Hotel,* 221 Miss. 723, 74 So. (2nd) 830; *Blair* v. *Armour and Company* (Mo.) 306 S.W. (2nd) 84, and denied in *Crown Woodworking Co.* v. *Goodwin* (N.H.) 128 A. (2nd) 918, and *Iacone* v. *Cardillo,* 208 F. (2nd) 696 (2nd Cir.). There has been recovery where there was partial sight in *Kraushar* v. *Cummins Construction Corp.,* 180 Md. 486, 25 A. (2nd) 439, and *McCadden* v. *West End Building & Loan Association,* 18 N.J.M. 395, 13 A. (2nd) 665, and where the eye was of

practical use in *Florida Game & Fresh Water Fish Com'n v. Griggers* (Fla.) 65 So. (2nd) 723. The test of industrial usefulness or conversely industrial blindness was discussed or applied in *Iacone* v. *Cardillo, supra,* and *Powers* v. *Motor Wheel Corp.,* 252 Mich. 639, 234 N.W. 122, 73 A.L.R. 702. A statutory standard of vision was applied in *In re Green's Case,* 335 Mass. 302. 139 N.E. (2nd) 520, but not in *Old Dominion Stevedoring Corp.* v. *O'Hearne,* 218 F. (2nd) 651 (4th Cir.).

Certain cases require comment. In *Purchase* v. *Grand Rapids Refrigerator Company,* 194 Mich. 103, 160 N.W. 391, 392, cited by our court in *Borello's Case, supra,* the Michigan Court in holding there was loss of an eye, said:

> "The Legislature has not attempted a definition, or made a declaration, applicable to the case at bar, except in terms of the loss of an eye. It has not specified a normal eye, although it may be concluded that the law refers to an eye which performs in some degree the functions of a normal eye. A mere sightless organ might perhaps be considered no eye at all. The claimant has lost an eye, although an infirm one. It was not wholly useless as an eye. On the contrary, the testimony is that he could with it distinguish light and see approaching objects. As a result of the injury, there was disability, and the disability is 'deemed to continue for the period specified, and the compensation so paid for such injury shall be as specified. . . .' "

Under our statute, and not so far as it appears from the opinion in Michigan, there is a standard of vision equivalent to the loss of sight. In later cases the Michigan Court has applied the industrially useful test. Indeed, it does not appear that the Court intended otherwise in *Purchase, supra.* See *Powers* v. *Motor Wheel Corp., supra.*

In *In re Green's Case, supra,* the claimant in the first accident suffered a reduction in vision below the statutory

standard, stated by the court to be a condition of "industrial blindness," and had recovered full specified compensation equivalent to that available for loss or removal of an eye. The eye subsequently became blind and as a result of the second accident was enucleated. On these facts the Massachusetts Court denied an award for specific compensation for enucleation of an eye under the schedule.

The court said, at p. 522:

"In determining the amount of specific compensation payable under the act reduction of vision to 20/70 of normal is considered as the equivalent of the removal or total loss of use of the eye. Pizzano's Case, 331 Mass. 380, 382, 119 N.E. 2d 390. The amount of compensation provided in such case is not only the same as that payable for loss of an eye or for total loss of its use but is also made a standard for determining the proportional compensation payable for partial reduction in vision. Doubtless the reason for uniformity in the prescribed payments for reduction of vision, loss of the eye and loss of its use is that in all of these instances the effect on the employee is essentially the same, namely, blindness. The reduction in vision to 20/70 of normal results in a condition known as 'industrial blindness.' . . . In the present case the removal of the employee's eye by enucleation resulted in no additional incapacity for labor, except for the disfigurement, and for that he is given compensation. He has been fully compensated for the injury incurred in 1945, which caused his blindness, in accordance with the statute then in force and further payment for the surgical removal of the blind eye would result in double compensation for the same loss. We think that the words 'by enucleation' are merely descriptive of a means by which the total loss of sight may be affected . . . and after an award of compensation for such loss are not intended to authorize the payment of further specific compensation."

In *Old Dominion Stevedoring Corp.* v. *O'Hearne, supra,* the U. S. Court of Appeals, in refusing to hold that 20% visual efficiency was not a standard of industrial blindness while adopting the useful eye test, said at p. 653:

> "The second contention centers around the finding of the Commissioner that the claimant only possessed visual efficiency of 20 per centum in the injured eye prior to the accident. Section 908(c) of the Act provides that compensation for loss of 80 per centum or more of the vision of an eye shall be the same as for the loss of the eye; and it is argued that within the meaning of the Act, an eye with only 20 per centum visual efficiency is industrially blind and for its total loss no compensation can be allowed. We do not think that this can be inferred from the Act."

The case differs from the case at bar in that the 10% of normal vision with glasses of our Act is a recognized standard of industrial blindness. See, for example, *Shaw* v. *Rosenthal* (Ind.) 42 N.E. (2nd) 383; *Kinzie* v. *General Tire & Rubber Co.* (Ind.) 134 N.E. (2nd) 212. See also 99 C.J.S. *Workmen's Compensation* § 316; 58 Am. Jur., *Workmen's Compensation* § 290; annot. 142 A.L.R. 822, supplementing annot. in 8 A.L.R. 1324, 24 A.L.R. 1466, 73 A.L.R. 706, and 99 A.L.R. 1499; Longshoremen's and Harbor Workers' Compensation Act and cases, 33 U.S.C.A. § 901 *et seq.*

In summary, we hold that an "eye" within the phrase "loss of eye" in the schedule of injuries is an eye that is industrially useful, or, in other words, not industrially blind, and further, that by definition the statute establishes that an eye with vision of 1/10 or less of normal vision with glasses, is in a condition of industrial blindness. The claimant is therefore not entitled to compensation for presumed total incapacity under the schedule.

The entry will be

*Appeal sustained. Compensation under Section 13 of the Workmen's Compensation Act denied. Allowance of $250 ordered to petitioner for expenses of appeal.*