Bernice A. GONZALES (Employee), Appellant,

v.

JOHNSTON FOIL MANUFACTURING COMPANY, Employer,

and

Consolidated Underwriters, Insurer, Respondents.

No. 29644.

St. Louis Court of Appeals.

Missouri.

Sept. 3, 1957.

Paul Koenig and Thomas L. Sullivan, St. Louis, for appellant.

Luke, Cunliff and Wilson, St. Louis, for respondents.

RUDDY, Presiding Judge.

This is an appeal by an employee in a proceeding under the Workmen's Compensation Law from a judgment of the Circuit Court affirming an award of the Industrial Commission in favor of the em-

ployee. The Industrial Commission found that the employee sustained an accident arising out of and in the course of her employment resulting in ten percent permanent partial disability to the whole body of the employee.

The first point relied on by the employee is that the award is contrary to the overwhelming weight of the evidence since the uncontradicted evidence is that the employee was disabled from all work for sixty-two weeks at the time of the hearing. It is the contention of the employee that there should have been an allowance for temporary total disability and not one for permanent partial disability. If there was sufficient, competent evidence to support the award and it was not contrary to the overwhelming weight of the evidence, the employee's contention must be ruled against her and the award must be sustained. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647; Williams v. International Shoe Co., Mo. App., 213 S.W.2d 657.

The employee, Bernice A. Gonzales, was 30 years of age at the time of her injury. In the course of her employment with the Johnston Foil Manufacturing Company she had been sitting on a stool that had coats draped over the back of said stool. When the employee momentarily rose from the stool it fell over, because of the weight of the coats. The employee immediately sat down and, the chair having fallen, the employee fell backward in a sitting position striking her buttocks and back across a wood rung and her head on a concrete floor. This accident occurred on the first day of November 1951. A few minutes after the accident she had a terrific headache but had no other pains, and she testified she was just shaken up and felt sick.

She was taken to Dr. Reuben Smith by her employer. She testified he gave her some pills to take and told her to go home and rest. She remained at home for a little more than one week and then re-

turned to Dr. Smith. She continued with him for five or six weeks. During that time he taped her back and applied heat to her back and neck. She said her back started to hurt her a few days after she fell and that she never had any pain or difficulty with her back before the accident.

She further testified that Dr. Smith told her that "he didn't know what on earth was wrong" with her and when she asked him if she should see a medical specialist, he told her she didn't need any. He told her to try to go back to work. She did so and had to quit after working about three and one half hours. She testified that she has never worked at the plant since that attempt and hasn't been able to work since that time. About a month after the accident her legs started to bother her.

Later she sought medical assistance on her own account and visited Dr. Robert O'Brien. He prescribed a back brace which she secured and wore for several months. She saw him twice and had to discontinue his services because of inability to pay his bill when he told her it would be some time before her back would be well. Later she was referred by the employer and insurer to Dr. Leonard T. Furlow, Dr. A. H. Diehr and Dr. Henry G. Schwartz. Her attorneys sent her to Dr. Samson Wennerman, Dr. Joseph J. Gitt and Dr. Robert Mueller.

In connection with her household duties she testified that once in a while she mops the kitchen and washes the dishes and cooks a few meals. In addition she uses the automatic washer to wash clothes, but has been unable to do anything else. She said it hurts to bend her body and to move her head. At the time of the hearing she said she still suffers from headaches and continues to have pain in her neck and lower back. She said her legs hurt all the time, except when she stays off of her feet.

She saw Dr. A. H. Diehr on April 10, 1952, and again on September 26, 1952.

He suggested a myelogram be taken to ascertain if she had a vertebral disc injury. She said she agreed to submit to this test and also agreed to submit to this test on subsequent occasions. She presented herself to Dr. Henry G. Schwartz for the myelogram, but he didn't make the test. At the hearing she said she was still willing to submit to the test. Dr. Samson Wennerman, whom she visited on the suggestion of her counsel, also suggested a myelogram test. She said she didn't have it performed because of lack of funds.

She visited Dr. Leonard T. Furlow once and saw Dr. Henry G. Schwartz on one occasion. She was examined by Dr. Henry G. Schwartz at Barnes Hospital. She testified that during his examination he did not remove her dress or the brace she was wearing at the time and that he examined her while she was sitting on an ordinary chair.

She was examined on one occasion by Dr. Robert Mueller and on another occasion by Dr. Joseph J. Gitt. She visited Dr. Samson Wennerman for the first time on June 25, 1952, and has been treated by him since that time. She has made more than twenty visits to his office. He prescribed a brace or corset for her, which she is still wearing, and applied heat therapy. The brace he prescribed cost $16 and the one purchased on the advice of Dr. Robert O'Brien cost $15.

Dr. Joseph J. Gitt, a medical specialist in nervous and mental diseases, called as a witness by the employee, testified that he examined her at his office on November 24, 1952. On that examination she held her body slightly flexed to the left. There was tenderness to percussion over the fifth lumbar vertebra with radiation of pain down the left lower leg. Upon extension of the left lower leg she had some pain radiating along the sciatic nerve due to irritation of that nerve. The right ankle jerk was slightly less active than the left. He further testified that she walked with a limp. It was his conclusion, after the ex-amination, that the employee should be hospitalized for further study and should have a myelogram or diskogram made. He further testified that "the herniated disc she had was due to trauma" and was the result of the accident. It was his opinion that at the time he saw her "she couldn't carry out a full day's work." He further testified that inasmuch as there had been no lessening of her distress since the injury occurred, he did not think she would get any better without surgical intervention. He explained that the myelogram he suggested was a diagnostic procedure and is made in order to find out what is wrong with the patient. However, he testified he was satisfied that his clinical diagnosis was correct, but that a myelogram would provide additional information that would be helpful. He said the herniated disc was at the level of the fifth lumbar vertebra.

Dr. Samson Wennerman, called as a witness by the employee, testified that he saw her for the first time on June 25, 1952, and has seen her about twenty times since then. In his examination of her he found that straight leg raising caused pain in the back and down the legs. He described this as the Lasegue sign. He said she arose from the examination table slowly and apparently in pain. There was an exaggeration of the lumbar lordosis. He found tenderness at the base of the skull and in the lower part of the neck. The knee jerks were present, but he elicited no left ankle jerk. The x-rays taken were negative, except that plates of the lower back revealed the coccyx turned somewhat to the left. However, he was not too sure that the displacement of the coccyx was the result of the accident, pointing out that this is a common finding in any woman who has borne children. The employee testified she had two children. He further testified that the x-rays also showed a possible fracture through the facet of the fourth lumbar on the left, however, on cross-examination he said, "it is not definite enough for me to make a diagnosis. I don't think it is there." On direct examination it was

his opinion that employee was suffering from strain of the neck muscles, a low back strain, a possible ruptured disc and nervousness. It was his opinion that the conditions he found were caused by the accident.

He further testified that she was not able to work at the time of the hearing, and that her condition will continue indefinitely if she doesn't receive treatment. After her first visit to him he prescribed short-wave diathermy and a low back belt. He also advised her to have a myelogram made. His charge for the treatments was $60.

During cross-examination he said he was not positive about the existence of a ruptured disc, but suspects one is there. When he was asked if he had a very clear and positive opinion about the employee's back, he said, "I am not certain * * *." He also said that "I don't know what is wrong with this woman. I think she may have or possibly may have a ruptured disc, but I think it should be pursued further to find out."

Dr. Robert M. O'Brien, a physician specializing in bone and joint surgery, was called as a witness by the employer and insurer. He testified that he saw the employee on December 21 and December 27, 1951, and that she was not sent by the employer or insurer. He further testified that she complained of a severe pain in the lower part of the back and that her legs hurt. She told him when she moved her head she gets a pain in the head and that the back of her neck hurts.

His examination disclosed that she walked in a stooped and forward position, supporting herself by placing her left hand on the front surface of her left thigh. He found no abnormalities in the neck portion of the spine. She complained of pain in her head on the extremes of bending motions of the neck in all directions. She carried out a normal range of motion in the neck. He found that the spine was straight and that she tended to stand stooped forward, although, when asked to do so, she could correct her posture and stand erectly. Tenderness was found over the entire lumbar spine and over the upper part of the sacrum. No other palpable abnormalities were found. She carried out a normal range of bending motions on a twisting motion of the thoracic and lumbar spine, but complained of pain in the lower part of her back on the extremes of the motions, particularly on backward bending. The straight leg test was negative. The knee jerk and ankle jerk reflexes were equal and active. Dr. O'Brien said that these tests indicated there was no involvement at that time of any appreciable nature of the sciatic nerve and its branches, and that there was no nerve root irritation or nerve root damage. He further testified that his findings in the above regard would indicate that the employee probably did not have an intervertebral disc lesion. The X-rays showed no abnormalities.

On the second visit the employee stood and walked erectly. He further testified that the two examinations he made showed no objective abnormalities. Based on her complaints and history he thought she could have sustained a straining or contusing type of soft tissue injury to her low back region. However, it was his opinion that there was probably some functional exaggeration of her symptoms.

It was his opinion that she did not have an intervertebral disc lesion. He did not and would not recommend that she have a myelogram made. He prescribed a back brace and some medicine to relieve her pain and nervousness. On cross-examination he admitted that conditions and symptoms of an injury to intervertebral discs vary from time to time.

The employer and insurer offered in evidence the deposition of Dr. Henry G. Schwartz. He testified that he was a neuro-surgeon and had examined the employee on December 11, 1952. He found her gait slow with flexion of the back, but

when her attention was distracted her back became straight. She walked well on tiptoes and on her heels. On standing the back was straight with no muscle spasm. The mobility of the back was good in all directions. The straight leg raising could be performed to ninety degrees on both sides which, he testified, was normal. However, when the legs were raised beyond ninety degrees she complained of pain. The motor power was excellent and he found no sensory deficit. The knee and ankle reflexes were brisk and equal.

He further testified that there were no objective findings indicating a disc injury and in his opinion the employee was not suffering from any disc lesion. The x-rays examined by him were negative. He further testified that an examination that disclosed a list of the back, difficulty in moving about and a difference in ankle jerks are insufficient findings to make a conclusion that a disc injury was certain. It was his opinion that the employee was not suffering from a herniated or ruptured disc and was not in need of a myelogram or further studies to determine if she had a disc injury. On cross-examination he testified that he didn't remember if she was wearing a back brace at the time of his examination and whether he had her on a table or chair for the leg raising test. He further stated that she was not fully clothed at the time of his examination.

Dr. A. H. Diehr was produced as a witness by the employer and insurer. He testified that the general nature of his practice was orthopedic surgery and that he examined the employee, Bernice A. Gonzales, on two occasions, namely, April 10, 1952, and September 26, 1952. In these examinations she complained of having discomfort in her lower back extending down into the buttocks. He found that her spine was in good alignment and that her bending and stooping positions were executed normally, although somewhat slowly. He found no sensory disturbances or limitation in movements of her upper extremities. There was no muscular contraction on palpation of the back and on flexing and rotating the thighs there was no restriction in movement, although all of her back movements were executed slowly. Dr. Diehr found the straight leg movements were not limited or restricted and found no sensory disturbances of the lower extremities and no pathological reflexes in this area. He found the knee and ankle reflexes were present and equal and there was no limitation or restriction in the movements of the head at the neck and no muscular contraction in this area on palpation. He took x-rays of the head, neck, lower back and the lumbar region of the coccyx and pelvis. They showed no evidence of fractures or dislocations or any other abnormality. He testified that at the time of the examination he did not believe there was a disc injury, but in order to eliminate the possibility of any disc injury he suggested that she be sent to a neuro-surgeon to determine whether myelograms should be done. He sent her to Dr. Leonard T. Furlow. At the hearing before the Referee when given the report of Dr. Furlow concerning his examination, wherein Dr. Furlow found that there was no objective evidence to sustain the subjective complaints of the employee and further found that she was not a neuro-surgical problem, Dr. Diehr stated that he was still of the opinion that there was no disc injury and that having a myelogram made and further tests were not justified. He further testified that based on her subjective complaints the employee may have some permanent disability which he estimated would not exceed 10% permanent partial disability.

He further testified that he thought she could do some work. His opinions, he testified, were based on his clinical findings from which he could not account for the gravity of the employee's complaints.

Another witness called by the employer and insurer was Dr. Reuben Smith who first saw the employee on November 1,

1951. He testified that she complained of pain in the occipital region of the skull extending down into the muscles of the neck. He further testified that his examination disclosed tenderness and pain on motion of the neck with no limitation of motion. Her reflexes, blood pressure and pulse were all normal. On the first examination he thought there was a soft tissue injury due to the trauma. He saw the employee again on November 12th at which time she complained of pain in the lower back region. He then had some x-rays taken which he found to be negative. He continued to see the employee until December 13. During her visits he gave her some physiotherapy treatments and some medication. He further testified that he found no objective evidence of injury and it was his opinion she had some sprain of her lower back with some soft tissue injury.

Dr. Leonard F. Furlow, called as a witness for the employer and insurer, testified that he was a neuro-surgeon. He examined the employee on May 8, 1952. His examination detected no abnormality of the scalp or cervical spine. He said her head could be turned normally without any complaint and her arm reflexes were equal and active. The knee jerks and ankle jerks were both present and equal. He found no pathological reflexes in her feet and sensation to pin prick seemed to be equal over the two lower extremities. She was able to perform straight leg raising well on both sides. He further testified that she said the leg raising caused her some pain but she went almost to 90 degrees in the straight leg raising without hesitation. He found no abnormality in her spine and no tenderness to deep pressure over the cervical spine.

He further testified that she complained of some tenderness to deep pressure over the occipital region. In his opinion there was no evidence of any abnormality of the spinal cord or of any of the nerve routes. He did not think she was a neuro-surgical problem in any sense of the word. He said he could find no evidence of a disc lesion and would not recommend a myelogram. He stated that the tests he made were sufficient to bring forth evidence of a disc lesion if one was present, adding that occcasionally a ruptured disc may be present with no definite neurological signs but that such an occurrence is unusual.

■ The question presented by the first point relied on by the employee is whether the award of the Referee and the Industrial Commission that the employee sustained a ten percent permanent partial disability is contrary to the overwhelming weight of the evidence. As heretofore stated, it is the position of the employee that the uncontradicted evidence is that she was disabled from all work for sixty-two weeks at the time of the hearing.

The medical evidence heard by the Referee and reviewed by the Industrial Commission presented a single controversy, i. e., whether or not the employee had sustained an injury to an intervertebral disc. All of the medical evidence showing the examinations, findings and conclusions of the doctors who examined and treated the employee has been stated by us as fully as the record warrants. A reference to the conclusions reached by the various doctors shows that only one of them was certain that the employee had a herniated disc. This was Dr. Joseph J. Gitt who testified in behalf of the employee. The only other medical witness who testified in behalf of the employee stated that he was not certain what was wrong with the employee, but thought she may have or possibly may have a ruptured disc.

Opposed to the certain opinion of Dr. Gitt and the uncertain opinion of Dr. Wennerman were the positive opinions of the five doctors who testified as witnesses for the employer. They were all certain she had no disc injury. The only medical witness for the employer and insurer who seemed to waver in his conclusion was Dr. A. H. Diehr. He did not believe there

was a disc injury, but, in view of the employee's long period of complaints, he thought she should be examined by a neuro-surgeon to determine whether a myelogram should be done, in order to eliminate the possibility of any disc injury. He sent her to Dr. Leonard T. Furlow, a neuro-surgeon. After reading the report of Dr. Furlow, who concluded that the employee was not a neurosurgical problem, Dr. Diehr stated that she was not suffering from an inter-vertebral disc injury. The conclusions giv-en by the medical witnesses who testified for the employer and insurer were amply sup-ported by the clinical findings they recited in their testimony. They all found that the employee could carry out a normal range of motion in the neck; that her spine was in good alignment, and that, although she had a tendency to stand in a stooped position, when asked to do so, she could correct her posture and stand erectly. They found the straight leg test negative and that she could carry out a normal range of bending motions. They found the knee and ankle reflexes were equal and active and the x-rays taken were all negative. No abnormal restriction in the movements of the head, neck or lower extremities and no abnormalities in the back were found. They were unable to account for her com-plaints. All of their conclusions were con-sistent with their clinical findings. All of the doctors testifying for the employer and insurer were unanimous in their opinions that a myelogram was not necessary.

As heretofore stated, the employee con-tends that the uncontradicted evidence shows that she was disabled from all work for sixty-two weeks. It is true that the medical witnesses, who testified for the employee, stated that she was not able to work at the time of the hearing, but this testimony is contradicted by the testimony of Dr. A. H. Diehr who testified for the employer and insurer. Dr. Diehr testified that he found nothing in his examination that would prevent the employee from doing some work. The employee, Bernice A.

Gonzales, testified that Dr. Reuben Smith told her to return to work. Obviously, it must have been his opinion that she could work.

The testimony, as we view it, presents two conflicting medical opinions regarding the condition of the employee and the nature and extent of her injuries. The employee's medical testimony would sup-port a finding that the employee is suffer-ing from a ruptured or herniated disc and is unable to work, whereas, the employer's and insurer's medical testimony supports the finding that the employee is not suffer-ing from a disc injury and was able to do some work at the time of the hearing. Where there are two conflicting medical theories presented by the evidence this court set out the course to be followed in the case of Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, loc. cit. 662, where we said:

"The case at bar is one of that type of cases which frequently arise where the ultimate question of the right to compensation depends upon the ac-ceptance of one of two conflicting medical or scientific theories regard-ing the cause of the injury or death. In such a situation it is uniformly held that the question is one of fact for the Commission to determine, and that its award, whether for or against the claimant, may not be said to be without substantial evidence to support it. Driemeyer v. Anheuser-Busch, Inc., Mo.App., 153 S.W.2d 821; Lewis v. Champ Spring Co., Mo.App., 145 S.W. 2d 758."

The Referee in the first instance and the Industrial Commission subsequently were faced with two sets of medical opinions that were in irreconcilable conflict. As stated in the aforesaid case the question then becomes one of fact for the Industrial Commission to determine. Under such cir-cumstances the award may not be said to be without substantial evidence to support it.

In the instant case the Industrial Commission found that the employee had sustained ten percent permanent partial disability. The employee in opposing this finding contends that the Commission should have found temporary total disability. The finding of the Commission was one of fact for its determination and was amply supported upon the whole record. This finding of the Commission that the employee sustained a ten percent permanent partial disability finds support in the testimony of Dr. A. H. Diehr when he testified that based on the subjective complaints of the employee he thought she may have some permanent partial disability which he estimated would not exceed ten percent. It was the duty of the Commission to make its own finding of fact as to the extent of the employee's disability. The finding it made and the award it made based on this finding is supported by competent and substantial evidence upon the whole record and the said finding and award is not contrary to the overwhelming weight of the evidence.

The next point relied on by the employee is that the Referee and the Industrial Commission erred in not making an allowance for the medical expense which she incurred.

■■ We ruled in the case of Sams **v.** Hayes Adhesive Co., Mo.App., 260 S.W.2d 815, loc. cit. 820, that the question relating to the claim for medical benefits is one of fact for the Commission. We also pointed out that the Commission's finding in this regard is to be reviewed in the same manner as any other issue of fact and that the burden of proof and persuasion was upon the claimant.

■ A review of the evidence on this point discloses that the Commission did not err in refusing to allow the employee the medical expenses she sustained in connection with the doctors she selected on her own account. The record shows that immediately after the accident the employee was sent by the employer to Dr. Reuben Smith who treated the employee for some time. Thereafter, the employee sought medical treatment and advice from Dr. Robert O'Brien on her own account and she was sent to Doctors Mueller, Wennerman and Gitt by her attorneys. At no time was there any refusal on the part of the employer or insurer to furnish additional medical treatment. She visited the doctors of her own choice without consulting the employer or insurer or securing their permission. Under a similar state of facts, we ruled in the case of Kopolow v. Zavodnik, Mo.App., 177 S.W.2d 647, loc. cit. 654, and in Sams v. Hayes Adhesive Co., supra, that there was an election by the employee to select her own physicians at her own expense. This contention is ruled against the employee.

■ The final point relied on by the employee is that the Circuit Court erred in not sustaining her Motion to Remand. Approximately one year after the employee filed her notice of appeal to the Circuit Court, she filed in the Circuit Court the aforesaid Motion to Remand, wherein she requested the Circuit Court to remand the case to the Commission so that she may place in the record the results of a myelogram test made subsequent to the Commission's Final Award and while the case was pending disposition in the Circuit Court. The employee contends that all the liberal and humanitarian elements of the compensation law demand that this case be remanded to the Commission so that the employee may offer evidence of the result of the myelogram test.

■ The employee cites authorities that are wholly inapplicable to the point raised. The authorities cited present the rule that the Workmen's Compensation Law is to be liberally construed. Stephens v. Spuck Iron & Foundry Co., 358 Mo. 372, 214 S.W.2d 534; Friede v. George Lytle, Inc., 235 Mo.App. 64, 127 S.W.2d 40. This rule governs the duty of the Commission when applying the law to the facts at the time

of the hearing. Likewise, this rule is to be followed by the appellate court when reviewing the record made before the Referee and the Commission.

The employer and insurer contend that the Motion to Remand was, in effect, a request for leave to present additional evidence and that the Circuit Court had no jurisdiction to grant such request. We agree with the position asserted by the employer and insurer and rule that the Circuit Court had no authority to entertain this Motion and was correct in denying same.

Section 287.490 RSMo 1949, V.A.M.S., provides:

"* * * The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds *and no other:*

"(1) That the commission acted without or in excess of its powers;

"(2) That the award was procured by fraud;

"(3) That the facts found by the commission do not support the award;

"(4) That there was not sufficient competent evidence in the record to warrant the *making of the award.*" (Emphasis ours.)

It is clear from a reading of the aforesaid section of the statutes that the Circuit Court and this court on appeal may not modify, reverse, remand for rehearing or set aside the award of the Commission upon any ground other than one or more of the four specifically named in the statute. We have found that the award is supported by competent and substantial evidence upon the whole record and is not contrary to the overwhelming weight of the evidence, which disposes of grounds numbered 3 and 4.

There is no charge by the employee that the Commission acted without or in excess

of its powers (ground No. 1) or that the award was procured by fraud (ground No. 2). Therefore, it is clear that the Circuit Court had no right or jurisdiction to consider the employee's "Motion to Remand."

In the case of Lewis v. Kansas Explorations, 238 Mo.App. 697, 187 S.W.2d 524, 527, after the Commission made its final award, the employee filed with the Commission a "Motion for Reconsideration" to which was attached copies of reports of two doctors with the results of their findings and conclusions. This motion requested an opportunity to introduce further medical evidence. In that respect it is similar to the "Motion to Remand" in the instant case. The record did not indicate what action was taken by the Commission on the "Motion for Reconsideration" in the Lewis case, supra. An appeal to the Circuit Court was taken by the employee and the record before the Commission, together with the transcript of the testimony taken before the Referee, was certified to the Circuit Court. Thereafter, it appears that the Circuit Court permitted the employee to introduce his Motion for Reconsideration and the exhibits attached thereto as evidence on appeal. The Circuit Court rendered the following judgment which reads, in part, as follows·

"After an examination of the transcript of the Workmen's Compensation Commission and hearing the argument of counsel, the Court finds that said Commission acted arbitrarily in refusing the request of claimant to offer additional medical evidence on final review by the full Commission, and that its refusal to hear such proper evidence was an abuse of its discretion. * * *" (187 S.W.2d loc. cit. 526.)

The Springfield Court of Appeals in ruling on the judgment of the Circuit Court said:

"There is nothing before us to indicate arbitrary action or abuse of discretion on the part of the Commis-

sion unless it can be said employee's so called Motion for Reconsideration and the exhibits attached thereto constitute a part of the record in the case. There is no provision in the Workmen's Compensation Act authorizing the Commission to entertain such motion after final award. There is but one course to pursue after final award by the full Commission and that is to appeal to the Circuit Court. The Motion for Reconsideration and the exhibits attached thereto were filed seven days after the Commission made its final award. Consequently it is our conclusion that such motion and exhibits were not properly a part of the record in the case and should not be so considered. The transcript as certified by the Commission to the Circuit Court did not include these documents, obviously, on the theory, and rightly so, that they constituted no part of the record. The Circuit Court should be confined to the transcript of the proceedings and the evidence as certified by the Commission when reviewing an award, absent the charge raised for the first time 'that the award was procured by fraud.' * * * And the court's action in permitting the introduction of employee's Motion for Reconsideration and the exhibits attached thereto as evidence on appeal was irregular and unwarranted." (187 S.W.2d loc. cit. 527.)

To permit the employee, or, for that matter, the employer and insurer, to bring in new evidence after a final award has been made by the Commission, would seriously interfere with the finality of the Workmen's Compensation proceedings. If such a course was permitted, claimant could await the Commission's decision and if it was adverse, then search for new evidence in an effort to set aside the Commission's Award. Applying the aforesaid to the facts in this case, the employee, being uncertain of what results a myelogram would show, could postpone the test and rely on the opinions of her medical witnesses that she had a disc lesion and then await the Commission's action on the award. If the Commission's findings and award were adverse to the employee she could then, with nothing to lose, submit to the myelogram test and if the test was favorable to her, she could then ask the Commission to reopen the proceedings for further medical testimony. It is our opinion that having elected to submit her case on the evidence then available, she shouldn't be permitted to alter her trial strategy.

We think the Circuit Court in the instant case was correct in denying the employee's Motion to Remand, because the Circuit Court lacked jurisdiction to consider it on appeal. The Circuit Court is confined to the transcript of the proceedings before the Commission. Harris v. Harris, Mo. App., 150 S.W.2d 760; State ex rel. May Department Stores Co. v. Haid, 327 Mo. 567, 38 S.W.2d 44; Lewis v. Kansas Explorations, supra.

The judgment of the trial court affirming the findings and award of the Industrial Commission should be affirmed by this court. It is so ordered.

MATTHES and ANDERSON, JJ., concur.